PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1881
_____

UNITED STATES OF AMERICA

v.

MICHAEL LUDWIKOWSKI,
                                        Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 1-16-cr-00513-001)
District Judge:  Honorable Jerome B. Simandle

_____

Argued June 18, 2019
Before:  AMBRO, RESTREPO and FISHER, *Circuit Judges*.

(Filed:  December 5, 2019)

Lisa A. Mathewson  *[ARGUED]*
Suite 810
123 South Broad Street
Philadelphia, PA 19109
        *Counsel for Appellant*

Mark E. Coyne, Assistant United States Attorney
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ 07102

Craig Carpenito, United States Attorney
Norman Gross, Assistant United States Attorney  *[ARGUED]*
Office of United States Attorney
Camden Federal Building & Courthouse
401 Market Street
Camden, NJ 08101
   *Counsel for Appellee*

———

## OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

  After Michael Ludwikowski went to the police station to report that he was receiving extortionate threats, the police questioned him extensively about why he was vulnerable to extortion. As it turned out, Ludwikowski, a pharmacist, had been filling fraudulent oxycodone prescriptions. He was later tried for distribution of a controlled substance. He moved to suppress the statements he made at the police station, arguing that they were inadmissible because no one read him his *Miranda* rights. The District Court denied the motion, and he was ultimately convicted.

  Ludwikowski appeals the denial of his motion to suppress. After careful review, we conclude that he was not in custody and therefore no *Miranda* warnings were needed. We

2

also conclude that his other arguments are unpersuasive: his statements at the police station were not involuntary, and there was no plain error in the admission of expert testimony on the practice of pharmacy. We will therefore affirm.

## I. Factual Background

Ludwikowski was a pharmacist who owned two independent pharmacies in Medford, New Jersey. Around March 2013, Ludwikowski told two of his customers, Matthew Lawson and Dontees Jones, that he could no longer fill their oxycodone prescriptions. On June 18, 2013, Ludwikowski received a series of threatening text messages saying things like: "THINK ABOUT IT, [YOU'RE] IN TOO DEEP . . . LOYALTY IS THE KEY, [THERE'S] NO I IN TEAM PLEASE CONSIDER MY WISHES OR [I'M] FORCED TO TAKE OTHER ROUTES IT MAY BE VERY DETRIMENTAL"; and "I GUESS WE'RE PLAYING HARDBALL I REALLY THINK [YOU] SHOULD SIT AND THINK GOT [A LOT OF] DIRT ON YOU MIKE AND BOY YOU GOT [A LOT] GOING ON. . . ." App. 639-46. Ludwikowski also received a letter hand-delivered at his pharmacy that said, "No one is safe unless you meet our [list] of demands, not your kids, family, you or [your employee] Dave." App. 74, 666. The letter demanded thousands of oxycodone and Adderall pills (listing dosages and types) and $20,000 in cash.

Ludwikowski contacted his uncle, a New York FBI agent, who in turn called the FBI's Trenton office. Agent William Hyland, who picked up the case, spoke to Ludwikowski by phone on Friday and Saturday, June 21 and 22, 2013. Ludwikowski told Agent Hyland that "shady people . . . [came] to his pharmacy to pay cash to fill prescriptions for oxycodone," App. 75, and said his erstwhile customers Lawson and Jones might be the extorters. Agent Hyland also learned,

3

from Detective Bill Knecht of the Medford Township Police Department, that there was an open investigation into possible criminal activity at Ludwikowski's pharmacy. Agent Hyland and Ludwikowski arranged that Ludwikowski would go to the Medford police station for an interview on Monday, June 24.

As planned, Ludwikowski drove to the police department on June 24. He was interviewed beginning around 10:15 a.m. and remained at the station until about 5:30 p.m. Because *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966), requires us to determine whether Ludwikowski was in custody given the totality of the circumstances, we recount the interview in some detail.

Detective Knecht and FBI Special Agent Stephen Montgomery interviewed Ludwikowski in a small eight-by-eight-foot room that contained a round table and three chairs. It had the atmosphere of a bare-bones conference room, with carpet on the floor and typical office furniture. Ludwikowski sat closest to the door and was not physically restrained. He was given water, which he drank, and offered pizza, which he refused. He went to the restroom, unaccompanied, at least three times. However, he asked permission before he went. Out of the seven hours Ludwikowski was at the station, he was interviewed for about four. The interview took place in three phases, punctuated by breaks.

## A. The First Phase

In the first portion of the interview, the officers obtained background information on Ludwikowski and learned about the threats he had been receiving. Ludwikowski told the officers that "the controlled substance thing"—by which he meant "[p]eople comin' in, trying to get drugs"—was "a long-term problem. We've been dealing with it for years." App. 326. He talked at length about a former employee, Krystal Wood,

4

whom he had recently fired because of suspected drug abuse and theft. Discussion then turned to Jones and Lawson, the potential extorters. Ludwikowski described them coming in with prescriptions for different people and bringing in their friends. Ludwikowski said he and his employees were "naïve" and "filled [the prescriptions]." App. 426-27.

Just before the first break, Detective Knecht and Agent Montgomery spoke to each other briefly, and Agent Montgomery said to Ludwikowski, "We'll be right back. Excuse me. Do you need to use the bathroom or anything?" App. 450. Ludwikowski asked for a drink of water, and then he left the room and re-entered with water.

## B. The Second Phase

The officers returned twenty minutes later, at which point their style of questioning shifted. Rather than listening to Ludwikowski and asking clarifying questions, as they had during the first phase, they asked pointed questions and suggested that Ludwikowski knew more than he was saying.

The officers went over the threatening text messages with Ludwikowski. Detective Knecht focused on the message that said, "I got a lot of dirt on you Mike." App. 469. When Ludwikowski posited that the "dirt" might be "a lie," Detective Knecht responded decisively, "No. Not a lie. . . . Mike. Mike. Stop. . . . Everybody's done somethin' [messed] up. Everybody's made mistakes. What goes through your mind immediately when they say, 'I got a lot of dirt on you, Mike'[?]" App. 470. Ludwikowski eventually answered, "[T]he only thing I kinda could've thought of was, was prescriptions." App. 471. Agent Montgomery replied, "Well, that's what we were thinking. . . . I mean we're all looking on this at its face." *Id.* Detective Knecht added, "It sounds like you might have been, you know, filling scripts for these guys; that

5

would piss 'em off that you're not doin' it. . . . [Y]ou had been doing it for a couple of years. . . ." App. 472. Ludwikowski answered, "Probably. . . probably. . . probably." *Id.*

A few minutes later, Agent Montgomery said, "So, it, it appears on the surface that, you know, to us, you could've been working with these guys. . . . Now, we're giving you an opportunity now to tell us the truth." App. 475-76. Ludwikowski answered, "I was not, I didn't have no involvement with anybody. . . ." App. 476. The officers also noted that Ludwikowski was making around $16,000 a month filling oxycodone prescriptions for cash; they said, "[T]hat would cause a lot of people not to ask questions because it's very lucrative. Okay?" App. 484. Ludwikowski responded, "I, I'd have to agree. Yeah." *Id.* Ludwikowski continued to focus on his former employee, Wood. In response, Detective Knecht said that law enforcement was "willing to do. . . whatever we need to do to help you and try to keep you and your family. . . safe," but that Ludwikowski needed to "[c]ut the [nonsense]. Alright?" App. 499.

The officers continued to probe whether Ludwikowski had been in business with his extorters, observing that they were "very specific . . . about what you've done." App. 524. The officers asked if anybody came in and said that Jones needed pills. When Ludwikowski said he did not know, Detective Knecht responded, "Well, that's, that doesn't seem like a very truthful answer. Okay?" App. 518.

After some time, Detective Knecht told Ludwikowski, "September of 2010, I opened an investigation on you" that led to the arrests of several people. App. 544. Ludwikowski said, "I never knew anybody got arrested." App. 546. Detective Knecht responded, "That's contrary to what we . . . know." *Id.* He went on to emphasize that Ludwikowski was a subject of

6

the investigation and that Ludwikowski's past activities had gotten him in trouble:

> But the fact of the matter is, you're not aware of a lot of this Mike because you were a part of the investigation. You were somebody we were lookin' at and, and your involvement. Okay? Now, after you've been doin' this for the last two and a half, three years . . . it's come back to bite you in your ass because now you have somebody or a group of somebodys that are willing to do harm against you and your family. . . .

App. 548. Ludwikowski said, "I'm very, like I said, very naïve and, and trusting. . . ." App. 549. Detective Knecht responded, "You . . . say naïve and trusting . . . and I'll change it to greedy." *Id.* Ludwikowski responded, "Okay." *Id.* A few minutes later, the detective told Ludwikowski, "I find it hard to believe an educated guy . . . you went to college for how long . . . you run a business . . . I find it very hard to believe that . . . flags didn't go up and say . . . these . . . people are coming here for a reason?" App. 564-65.

Detective Knecht also told Ludiwkowski that "taking these scripts, you know, and not doing the . . . checks that you should've done? It's not criminal. I'm not gonna arrest you for it, okay?" App. 589. Eventually, Agent Montgomery said, "We'll be right back, alright?" App. 604. As the officers left, Ludwikowski asked for another glass of water, which Detective Knecht brought about ten minutes later.

## C. The Third Phase

The second break lasted ninety minutes. Then Detective Knecht returned alone and resumed the interview without any explanation for the delay. He asked, "Anything else you thought about while you're sittin' in here for the last little bit

7

that we were out there?" App. 607. Ludwikowski answered, "I'm just freezing and I gotta go to the bathroom." *Id.* He smiled and laughed a little as he said it, then continued to answer Detective Knecht's questions in a relaxed body posture for a half hour before asking about the bathroom again.

The tone of the interview shifted again after the second break. Ludwikowski made a series of lengthy statements about his circumstances and motivations, becoming emotional at times. He said he stopped filling narcotics prescriptions because "the constant, every day, people comin' in . . . was relentless." App. 610. He said that "when my dad passed I had two hundred and some people that owed me money," and added, "I trusted too many people and it's definitely[] a lesson." App. 611-12. He said the oxycodone business was "the trend of what the pharmacy was about. You know, pharmacies were doin' it and doin' it and, you know . . . I just followed suit and I guess . . . I just didn't change quick enough." App. 624.

The third break began abruptly; an unidentified detective opened the door just as Ludwikowski was tearing up while saying, "I want my kids to be safe. . . ." App. 636. Detective Knecht said, "I'll be right back," and walked out. *Id.* He brought Ludwikowski more water and then left for nearly an hour. Upon his return, he again gave no explanation, but said he was ready to go to the pharmacy with Ludwikowski, as they had discussed. The two men left the station, and Ludwikowski drove himself to the pharmacy.

D. After the Interview

Ludwikowski called Agent Hyland the next day to report several more text messages, and Agent Hyland went to Ludwikowski's house to help him text with the unknown extorter. Ludwikowski also signed a form that day authorizing

the FBI to record his telephone communications. The extortion was eventually solved: Dontees Jones and Matthew Lawson were charged and pled guilty.

## II. Procedural History

In November 2016, over three years after the interview at the police station, Ludwikowski was indicted on six counts of drug distribution (21 U.S.C. § 841), two counts of maintaining premises for drug distribution (*id.* § 856), and conspiracy to distribute drugs (*id.* § 846). He filed a motion to suppress the statements he made after the first break during the June 24, 2013 interview, arguing that he was in custody and should have received *Miranda* warnings, and that his statements were involuntary. After a day-long evidentiary hearing, the District Court denied the motion.

Witnesses at Ludwikowski's subsequent 22-day jury trial included law enforcement officers, doctors whose prescription forms had been stolen to forge prescriptions, employees and others who were familiar with the operation of Ludwikowski's pharmacies, drug dealers and drug users who had filled prescriptions there, and an expert in the practice of pharmacy. A redacted version of the video of Ludwikowski's June 24, 2013 interview was entered into evidence and played for the jury.

The jury found Ludwikowski guilty of five of the six drug distribution charges and one of the two premises charges. It acquitted him of conspiracy. At sentencing, the District Court found by a preponderance of the evidence that Ludwikowski had acted in concert with others. It sentenced him based on hundreds of fraudulent prescriptions, rather than the five associated with the counts of conviction. By Ludwikowski's calculation, the consideration of the additional prescriptions put his sentence in the 151-188-month range,

9

rather than the 51-63-month range. The court ultimately sentenced him to 180 months. He appeals.

### III. Analysis[1]

### A. On the Unique Facts of This Case, *Miranda* Warnings Were Unnecessary

Ludwikowski argues that the District Court erred in denying his motion to suppress the statements he made during his June 24, 2013 interview. He contends that his statements are inadmissible because he was in custody and therefore needed *Miranda* warnings, which he did not receive. We review *de novo* the question of "[w]hether a person was 'in custody' for the purposes of *Miranda*," and we review the underlying factual findings for clear error. *United States v. Jacobs*, 431 F.3d 99, 104 (3d Cir. 2005). Under the clear-error standard, we accept the District Court's findings unless we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Howe*, 543 F.3d 128, 133 (3d Cir. 2008) (citation omitted).

Under the *Miranda* rule, "the privilege against self-incrimination is jeopardized"—and warnings are required—"when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." 384 U.S. at 478-79. "'[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). To determine

---

[1] The District Court had jurisdiction over Ludwikowski's offenses against the laws of the United States. 18 U.S.C. § 3231. This Court has jurisdiction over the District Court's final judgment and its judgment of sentence. 28 U.S.C. § 1291; 18 U.S.C. § 3742.

10

whether an individual was in custody, we first establish "the circumstances surrounding the interrogation." *Jacobs*, 431 F.3d at 105 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004)). Then we ask, as an objective matter, whether "a reasonable person [would] have felt that he or she was not at liberty to terminate the interrogation and leave." *Id.* (emphasis omitted) (quoting *Yarborough*, 541 U.S. at 663). In other words, was there a "restraint on freedom of movement of the degree associated with a formal arrest"? *Id.* (emphasis omitted) (quoting *Yarborough*, 541 U.S. at 663). This "freedom-of-movement test," however, "identifies only a necessary and not a sufficient condition for *Miranda* custody." *Howes*, 565 U.S. at 509 (quoting *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010)). We must "ask[] the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*

We are aided at the first step—establishing the circumstances surrounding Ludwikowski's interview—by the fulsome factual record created during the day-long hearing on the suppression motion. At that hearing, Detective Knecht and FBI Agents Montgomery and Hyland testified. In addition, the seven-hour video and transcript of Ludwikowski's interview were in evidence. At the end of the hearing, the District Court delivered extensive oral findings that were not clearly erroneous—that is, they do not leave us with the firm impression that there has been a mistake. *See Howe*, 543 F.3d at 133.

The District Court noted two "basic considerations": first, that "it was [Ludwikowski's] choice and not someone else's to answer the questions so that the crime . . . could be solved," and second, that the extortion was in fact solved because of Ludwikowski's answers. App. 261-62. The court

11

also found that "Ludwikowski certainly knew, before being interviewed on June 24th, that he would be asked for his interpretation of the threats he was reporting as well as exploring who could be issuing such threats." App. 259. The court "credit[ed] the testimony of Detective Knecht and Special Agent Montgomery, namely, they weren't laying some sort of trap to induce [Ludwikowski] to incriminate himself but rather they were trying to solve an ongoing and serious extortion." App. 260.

The court found that there were never more than two questioners in the room with Ludwikowski; no one blocked his exit; and officers used some "salty language," but nothing out of the ordinary for a police department. App. 260-61. The meeting, overall, was "businesslike" in tone. App. 262. "There was no posturing or shouting or pounding fists on the table or any display of emphatic behavior." App. 261. The court noted that seven hours is "a long time," but added that there were two breaks, and that Ludwikowski had his cell phone and his normal clothes. App. 262. Finally, the court observed that Ludwikowski "never indicated once that he did not want to answer questions. Instead he gave hesitant answers or inconsistent answers. His demeanor on tape was that of a person who was deflecting the questions or pretending not to know the answers." App. 262-63.

With "the scene . . . set," *Jacobs*, 431 F.3d at 105 (quoting *Yarborough*, 541 U.S. at 663), we move to the second step of the *Miranda* analysis and ask whether a reasonable person in Ludwikowski's circumstances would have felt free to go. Numerous factors help answer this question: the interview's location, physical surroundings, and duration; whether he voluntarily participated; whether he was physically restrained; whether other coercive tactics were used, such as hostile tones of voice or the display of weapons; and whether

12

the interviewee was released when the questioning was over. *Id.*; *United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006). We also consider whether the questioner believed the interviewee was guilty; whether the interviewee was specifically told he was not under arrest; and whether he agreed to meet knowing that he would be questioned about a criminal offense. *Jacobs*, 431 F.3d at 105-06. However, the "freedom-of-movement test" delineated by these factors "identifies only a necessary and not a sufficient condition for *Miranda* custody." *Howes*, 565 U.S. at 509 (quoting *Shatzer*, 559 U.S. at 112). We must "ask[] the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*

Ludwikowski argues that the District Court applied the wrong rule when analyzing whether a reasonable person would have felt free to leave. He points to the court's statement that "there's an objective and subjective element of [the custody analysis]." Appellant's Br. 36 (quoting App. 243). Ludwikowski is correct that the custody test is objective. *See Jacobs*, 431 F.3d at 105. The District Court may have been referring to the fact that some of the factors are framed in a subjective fashion, such as what the officers believed about the individual's guilt or innocence. *See id.* Regardless, it applied the test correctly, carefully considering the custody factors in light of the evidence before it. As we now explain, we agree with its conclusion that Ludwikowski was not in custody.

To start, Ludwikowski was not physically restrained. *Howes*, 565 U.S. at 509, 515. He did not feel "obligated to come to . . . the questioning," *Jacobs*, 431 F.3d at 105; rather, he went to the station to discuss the extortion because he feared for his family's safety. At the end of the interview, he was released and left in his own car. *See Howes*, 565 U.S. at 509;

13

*see also Jacobs*, 431 F.3d at 106-07 (unhindered release at end of questioning can be "an indicator of what the circumstances during the questioning would have made a reasonable person believe"). And, given the circumstances, we agree with the District Court's finding that Ludwikowski knew he would be questioned about the reasons behind the extortionate threats, including his own possibly criminal activities at the pharmacy. *See id.* at 106. All of these factors tend to show he was not in custody.

Other factors seem, initially, to weigh in the opposite direction. But upon deeper consideration, these factors, too, demonstrate that Ludwikowski was not in custody. For example, Ludwikowski was interviewed at the station house, where the pressures associated with custodial interrogation are "most apt to exist." *Jacobs*, 431 F.3d at 105 (quoting *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974)). Even so, he was not "whisked" to the station after an arrest, as in the classic *Miranda* scenario. *Howes*, 565 U.S. at 511. Rather, he arranged to go to the station voluntarily and had three days to think about the coming encounter with law enforcement. And, while the door to the interview room was kept closed after the first break, it was not locked. In these circumstances, the station-house location does not weigh in favor of custody.

The officers told Ludwikowski they thought he might be filling fraudulent prescriptions—and when officers have "more cause for believing the suspect committed the crime," there is a "greater tendency to bear down in interrogation and create the kind of atmosphere of significant restraint that triggers *Miranda*." *Jacobs*, 431 F.3d at 105 (quoting *Steigler*, 496 F.2d at 799). Here, though, the officers were trying to get to the bottom of the extortion, so they needed to question Ludwikowski about the subject of the threats. Therefore, the

14

questions about oxycodone distribution do not show the coercion associated with custody.

The interrogation was lengthy, whether we consider the time of the active questioning (about four hours) or the total time at the station (about seven). *See Howes*, 565 U.S. at 509. This factor could indicate that Ludwikowski was in custody, but, as the District Court found, "[m]uch of [the interview] was devoted to trying to identify who was the extorter and why [they would] be doing it," so the interview would have been shorter if Ludwikowski had been more responsive. App. 267. Ludwikowski criticizes the District Court's finding that the two breaks reduced the length of the active questioning and thus weighed against a finding of custody. He argues that the breaks were actually coercive because the officers gave him no warning before the breaks began, no indication of how long the breaks might last, and no explanation when they returned. However, Ludwikowski exaggerates or misreads these facts. While the officers departed the room relatively abruptly, they excused themselves before two of the breaks. App. 450 ("We'll be right back. Excuse me. Do you need to use the bathroom or anything?"); App. 604 ("We'll be back, alright?"). Ludwikowski was left alone, but not incommunicado; unlike a suspect, he had his phone, which he perused and used to make a call. In sum, the length of the interrogation, including the breaks, does not show that Ludwikowski was in custody.[2]

---

[2] Ludwikowski argues that the final break was gratuitous because the officers had no more questions for him after they returned. Thus, he argues, the break was merely a chance to "leav[e] [him] to contemplate his fears alone for another hour." Appellant's Br. 28. Ludwikowski cites no evidence to support his contention that the break was needless,

15

Along similar lines, Ludwikowski points out that he told Detective Knecht, after the second break, that he was "freezing" and had to go to the bathroom. App. 607. He asserts that because he did "not feel[] free even to seek an escort to the bathroom," he also did not believe he was at liberty to end the questioning and leave. Appellant's Br. 27-28. But the video shows that Ludwikowski smiled and laughed a little as he made this comment, and that he continued to answer questions in a relaxed body posture for a half hour before asking again about the bathroom. Given that he did not appear at all distressed, his argument about this exchange is unpersuasive.

Considering all these factors, the District Court did not err in concluding that a reasonable person in Ludwikowski's situation would have felt free to go. But even if we concluded the opposite, our analysis would not end there: constraints on freedom of movement are a necessary but not sufficient condition of custody. The individual must also be subject to "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509. In the "paradigmatic *Miranda* situation"—when an individual is "arrested in his home or on the street and whisked to a police station for questioning"—he is subject to "the shock that very often accompanies arrest," and he may feel pressured to speak in the hope that doing so will lead to his release or, down the road, to more lenient treatment. *Id.* at 511-12. Ludwikowski, by contrast, needed to report and end the extortion while simultaneously concealing his own bad acts. The Constitution does not protect him from that kind of pressure.

and it is equally possible that the officers were continuing their investigative activities.

16

Our conclusion is bolstered by examining a Fourth Circuit case where the defendant, like Ludwikowski, simultaneously tried to get help and conceal his own wrongdoing. In that case, the defendant, Jamison, wanted to hide that he had accidentally shot himself because he was a felon who was not permitted to possess a firearm. *United States v. Jamison*, 509 F.3d 623, 625 (4th Cir. 2007). The police began investigating in the emergency room, and when Jamison changed his story about how he had been injured, they questioned him closely and repeatedly about what had happened. *Id.* at 626. Jamison was later charged with being a felon in possession in violation of 18 U.S.C. § 922(g). He moved to suppress the statements he made at the hospital, arguing (like Ludwikowski) that he was in custody and should have received *Miranda* warnings. *Id.* at 627-28.

The Fourth Circuit began by pointing out that *Miranda* itself did not purport to make any rule governing "general questioning of citizens in the factfinding process." *Id.* at 631 (quoting *Miranda*, 384 U.S. at 477). Thus, the Court observed, "*Miranda* and its progeny do not equate police investigation of criminal acts with police coercion. This distinction is especially salient when the victim or suspect initiates the encounter with the police." *Id.* The Court held that "a reasonable person," "after providing shifting explanations" of the crime he was reporting, "would expect the police to question him further, lest they expend energy investigating false leads." *Id.* at 632. The Court ruled that the "most substantial restrictions of Jamison's freedom of movement" were "[t]he fact of [his] injury, the trappings of his treatment, and the routine aspects of the investigation he initiated." *Id.* at 633. These restrictions "far outstripp[ed] whatever additional impingement on his freedom to leave was presented by the officers during the ongoing police investigation into his

17

shooting." *Id.* Therefore, a reasonable person would have felt free to terminate the police encounter; Jamison was not in custody and no *Miranda* warning was needed. *Id.* at 632.

Although *Jamison* is not exactly like this case, there are important parallels. Jamison was restricted by his need for emergency medical treatment; Ludwikowski was constrained by the need to involve law enforcement to keep his family safe. Both Jamison and Ludwikowski, having initiated police investigations, could have reasonably expected the officers to investigate diligently and question them closely. Therefore, like Jamison, Ludwikowski was not in custody.

We emphasize that we apply the law only to the precise facts before us: the defendant was the victim of one crime and the perpetrator of another, intertwined crime; he reached out to police for help; and he engaged with the police in both an offensive and a defensive posture, reporting one crime while at the same time trying to conceal the other. Our analysis would have no bearing on a case lacking these facts.

## B. Ludwikowski's Statements Were Voluntary

Ludwikowski next argues that his incriminating statements should have been suppressed because he did not make them voluntarily. The issue is not resolved by virtue of our conclusion that Ludwikowski was not in custody. In "special circumstances," a confession might be involuntary even if the person giving it is not in custody. *Beckwith v. United States*, 425 U.S. 341, 347-48 (1976); *see also United States v. Swint*, 15 F.3d 286, 288-89 (3d Cir. 1994) (treating custody and voluntariness as separate inquiries). This case, however, is not the outlier contemplated in *Beckwith*; Ludwikowski's statements were voluntary.

The Government has the burden to prove, by a preponderance of the evidence, that Ludwikowski's statements

were voluntary—that is, "the product of an essentially free and unconstrained choice." *Swint*, 15 F.3d at 289 (quoting *U. S. ex rel. Hayward v. Johnson*, 508 F.2d 322, 326 (3d Cir. 1975)). There can be no involuntary confession absent "coercive police activity." *Jacobs*, 431 F.3d at 108. We consider the officers' tactics, including "the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep." *Halsey v. Pfeiffer*, 750 F.3d 273, 303 (3d Cir. 2014) (quoting *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986)). We also consider the defendant's characteristics, including his "youth . . . ; his lack of education or his low intelligence; the lack of any advice . . . of his constitutional rights," *id.* (quoting *Miller*, 796 F.2d at 604), and his "background and experience, including prior dealings with the criminal justice system," *Jacobs*, 431 F.3d at 108. All these factors assist in answering "the ultimate question[:] . . . 'whether the defendant's will was overborne when he confessed.'" *Halsey*, 750 F.3d at 304 (quoting *Miller*, 796 F.2d at 604).

At the outset, the District Court did not erroneously shift the burden of proof to Ludwikowski, as he argues. The court stated, at the suppression hearing, "Well, there's no *per se* rule that says the defendant has to testify as to his feeling of coercion . . . but I'm just thinking unless the agents say, yes, we forced him . . . against his will to speak. . . , I just don't know how the defendant would prevail. . . ." App. 65. While we do not agree with these musings,[3] they did not lead to any

---

[3] Defendants certainly can prevail on the voluntariness issue without testifying. *See, e.g.*, *Jacobs*, 431 F.3d at 108-12 (statements were involuntary; no indication that defendant testified); *Swint*, 15 F.3d at 290-92 (same). The testimony of law enforcement, the video of an interrogation, and a

error of law. The court later stated in its oral ruling that the Government had the burden to show the confession was voluntary, and it specifically ruled that the Government met that burden.

Ludwikowski argues that his will was overborne because he believed his freedom was constrained during the questioning. As we have explained, we disagree with the premise of this argument: a reasonable person would have understood he could leave. Moreover, Ludwikowski's calm demeanor and calculated answers belie his argument that he subjectively felt his freedom was constrained. Nor did the situation bear the hallmarks of coercion: the officers' conduct was not physically threatening, the door to the conference room was not locked, Ludwikowski was not deprived of food, and he had his cell phone.

Ludwikowski next contends that he was particularly vulnerable, as a victim of extortion, and that his questioners exploited those vulnerabilities in a coercive fashion. We do not doubt that Ludwikowski was genuinely fearful for his family's safety, and hence emotionally vulnerable. But we do not agree that his questioners used the situation coercively. Rather, they attempted to solve the extortion in the face of Ludwikowski's "hesitant" and "inconsistent" answers. App. 262-63 (finding that Ludwikowski's "demeanor on tape was that of a person who was deflecting the questions or pretending not to know the answers").

Finally, Ludwikowski argues his statements were involuntary because he did not know he was the focus of a criminal investigation. He cites cases where officers misled

defendant's background and characteristics could combine to show—even without the defendant's own testimony—that his will was overborne.

defendants regarding the circumstances of their questioning, but those cases are distinguishable. In *Jacobs*, the defendant had been a confidential FBI informant for ten years when she was summoned to the office by her handler, where she made a series of statements. 431 F.3d at 102, 104. We concluded the statements were involuntary because she was laboring under a misapprehension: the handler did not tell her she had been terminated as an informant. *Id.* at 107. Similarly, in *Swint*, the defendant went to the district attorney's office to "make an off-the-record proffer" regarding a possible plea agreement, a practice that was common in the county. 15 F.3d at 287. But the Government baited and switched the defendant: federal agents participated in the conversation, and discussion was not limited to his proffer. *Id.* at 290. Ludwikowski, unlike the *Jacobs* and *Swint* defendants, was not deceived or misled.[4]

We conclude by observing that Ludwikowski is mature and educated, a sophisticated business owner who was in sound mental and physical health at the time of the questioning. *See Halsey*, 750 F.3d at 306 (concluding there was a genuine issue of material fact regarding voluntariness where, among other factors, defendant was "a man of limited intelligence and little education"). Ludwikowski's statements at the police station were voluntary.

---

[4] Ludwikowski argues that, as in *Jacobs*, his continuing cooperation with law enforcement shows he did not know he was the subject of a criminal investigation. Unlike the *Jacobs* defendant, however, Ludwikowski continued to cooperate because the extortion needed to be solved, not because he was misled by law enforcement.

## C. There Was No Plain Error in the Admission of the Expert's Testimony

A medical professional like Ludwikowski may be convicted under 21 U.S.C. § 841 if he dispenses a controlled substance "outside the usual course of professional practice." *United States v. Moore*, 423 U.S. 122, 124 (1975). As part of its proof of this charge, the Government called Anthony Alexander as an expert witness on professional practice in the pharmacy field. Ludwikowski argues that the District Court erred by not excluding the expert's testimony about New Jersey pharmacy regulations, as well as his testimony about best practices and his own practices. Ludwikowski did not object at trial, so the plain-error standard applies: we will exercise our discretion to address an error only if it is plain, affects substantial rights, and "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467 (1997) (internal quotation marks, citations, and alterations omitted).

Ludwikowski is correct that an expert may "not testify as to the governing law of the case." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006). And, if we were to explicitly rule upon the nature of the "usual course of professional practice" standard, we would likely agree with our sister Circuits that the plain language of the standard shows it to be an objective one, not defined by a particular practitioner's habits. *United States v. Smith*, 573 F.3d 639, 647-48 (8th Cir. 2009); *United States v. Hurwitz*, 459 F.3d 463, 478-80 (4th Cir. 2006). But whatever the merits of his legal arguments, Ludwikowski cannot meet the demanding plain-error standard.

First, the expert's references to regulations did not affect his substantial rights—that is, they did not affect the outcome of the proceedings. *See United States v. Olano*, 507 U.S. 725, 734 (1993). The violation of professional standards

22

is so clear in this case that expert testimony is unnecessary. *See United States v. Pellmann*, 668 F.3d 918, 926 (7th Cir. 2012) (expert opinion unnecessary where doctor "personally administered [painkillers] in multiple, private houses and hotel rooms . . . for long-term treatment of a condition he was unqualified to diagnose"); *United States v. Word*, 806 F.2d 658, 663-64 (6th Cir. 1986) (expert opinion unnecessary where doctor "[wrote] prescriptions in return for sums of money ranging from $200 to $1,000. . . ; [gave] a patient an option as to what name a prescription for a powerful pain killer should be written in; . . . [and wrote] prescriptions at service stations, in a van, or in restrooms").

Ludwikowski filled narcotics prescriptions without verification or a log, including for customers who came to the pharmacy high. When customers made mistakes on prescriptions they forged, Ludwikowski helped them fix the errors. A customer who described himself as a drug addict obtained oxycodone from Ludwikowski six days a week—usually twice a day, but on one noteworthy day, five times. The prescriptions this customer brought to Ludwikowski bore numerous different names. The jury did not need an expert to explain that this conduct violated professional standards. Therefore, the expert's references to New Jersey regulations did not affect the outcome of the proceedings.

Nor does the expert's testimony about best practices, or his own salutary habits, meet the plain-error standard, because the testimony did not "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings." *Johnson*, 520 U.S. at 467 (internal quotation marks, citations, and alterations omitted). Ludwikowski's trial strategy was to undermine the expert by repeatedly highlighting where his best practices went beyond what was required. *See, e.g.*, App. 3637 ("I'm not asking what you would do. Obviously you're a meticulous guy.

23

. . . What do the pharmacy rules and regs require the pharmacist to do . . . ?"). The strategy was successful: the expert admitted numerous times that the regulations do not require the level of diligence he himself would undertake. In other words, defense counsel not only failed to object to the supposedly inadmissible testimony—he reinforced and capitalized on the testimony to further his trial strategy. Given his cross-examination of the expert, the jury was well equipped to determine whether Ludwikowski distributed substances outside the usual course of professional practice. Under these circumstances, the supposed error did not compromise the fairness or integrity of the trial, and we therefore decline to reach the merits of Ludwikowski's arguments.[5]

## IV. Conclusion

For these reasons, we will affirm the denial of Ludwikowski's suppression motion and the admission of expert testimony.

---

[5] Ludwikowski also argues that the District Court erred in basing his sentence partly on acquitted conduct. As he concedes, we must affirm. *United States v. Watts*, 519 U.S. 148, 149 (1997) (reversing decisions holding that "sentencing courts could not consider conduct of the defendants underlying charges of which they had been acquitted") (per curiam). Ludwikowski offers this argument to preserve it should the Supreme Court revisit the issue during the pendency of this appeal.