**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2437
_____

UNITED STATES OF AMERICA

v.

VINCENT INGINO,
                            Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3:18-cr-00379-001)
District Judge:  Honorable Malachy E. Mannion
_____

Submitted Under Third Circuit L.A.R. 34.1
on January 22, 2021

Before:  HARDIMAN and ROTH, *Circuit Judges*, and PRATTER,[*] *District Judge*

(Filed: March 5, 2021)
_____

OPINION[†]
_____

---

[*]     Honorable Gene E.K. Pratter, District Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

[†]     This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

PRATTER, *District Judge*.

Vincent Ingino claims a violation of his Fifth Amendment rights arising from an interview with Pennsylvania State Troopers who did not administer him *Miranda* warnings. Because we find that Mr. Ingino was not in custody at the time and voluntarily made incriminating statements, the District Court did not err in denying Mr. Ingino's motion to suppress. So, the Court will affirm.

## I. BACKGROUND

Over a weekend in August 2018, Pennsylvania State Police in Stroudsburg responded to two different emergency calls, each involving a man unresponsive due to an apparent drug overdose. Text message records recovered from the phones of the deceased showed recent correspondence with Vincent Ingino. At the time, Mr. Ingino was on probation. Shortly after the overdose deaths, he failed to report for his mandatory probation meeting. When he eventually did report to his probation officer, he tested positive for opiates and admitted to using drugs in violation of terms of his supervised release. His probation officer directed him to seek treatment and report back after completing the program. When Mr. Ingino missed the deadline to report that he completed his drug treatment program, the probation officer contacted a field unit team to visit Mr. Ingino's home.

Around this time, the Pennsylvania State Police investigating the overdose deaths obtained Mr. Ingino's address from his probation officer. One of the troopers then accompanied the probation field unit team on the Ingino home visit. Because Mr. Ingino

2

was not home at the time, the field unit team relayed to his girlfriend that Mr. Ingino was to report to the probation office for a meeting.

Mr. Ingino reported for his mandatory probation meeting, during which he failed his mandatory drug test. Because of the positive drug test, the probation officer told him to expect a letter in the mail setting a court date for a revocation hearing. The probation officer did not tell or imply to him that he would be arrested that day.

At the end of the meeting, the probation officer told Mr. Ingino that two troopers wanted to speak to him. He responded, "Okay." App. 77. The probation officer did not say what the troopers wanted to talk to him about. But it soon became apparent that the troopers were investigating the overdose deaths. The troopers met with Mr. Ingino in the same office where Mr. Ingino had just had his probation meeting, although the probation officer did not participate and left the room before the troopers' questioning started. The troopers stated that Mr. Ingino was not under arrest and that he would be walking out at the conclusion of the session regardless of what he said. They did not raise their voices or display their guns at any time. Although Mr. Ingino had failed his drug test earlier that day, he was able to recall specific information connected to the troopers' investigation. The interrogation lasted about 30 minutes.

Mr. Ingino was charged subsequently with two counts of distribution and possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(b)(1)(C). He moved to suppress his statements made to the troopers because he claimed the interrogation violated his Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). After a suppression hearing, the District Court denied Mr. Ingino's

3

motion. *United States v. Ingino*, 423 F. Supp. 3d 108, 110, 115 (M.D. Pa. 2019). The court credited the testimony from the hearing, the transcript, and the recording of the interrogation to find that Mr. Ingino voluntarily submitted to questioning in a non-custodial setting. *Id.* at 113–15.

Mr. Ingino proceeded to trial and was convicted on both counts. On appeal, he again challenges that his statements were made in a custodial setting and were not voluntarily given. We review factual findings on a motion to suppress for clear error. *United States v. Jacobs*, 431 F.3d 99, 104 (3d Cir. 2005). So, we will accept those findings unless we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Ludwikowski*, 944 F.3d 123, 130 (3d Cir. 2019) (citation omitted). We review *de novo* the ultimate question of whether a defendant was "in custody" for *Miranda* purposes. *Jacobs*, 431 F.3d at 104.

## II. MR. INGINO WAS NOT IN CUSTODY

*Miranda* protections attach to those who are "in custody." *Miranda*, 384 U.S. at 467-68. "'[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). To determine whether someone is in custody, the Court is guided by the following factors:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

4

*United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010) (quoting *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006)).

The classic, fact-bound considerations about the nature, setting, and duration of the interrogation, and Mr. Ingino's own statements show that he was not in custody at the time he made the statements at issue.

The District Court credited the testimony from the suppression hearing, the transcript, and the recording of the interrogation and made the following findings: (1) the troopers spoke to Mr. Ingino only after his meeting with his probation officer ended; (2) Mr. Ingino responded "Okay" when asked if he would speak with the troopers and cooperated with the questioning; (3) he was aware that he was not under arrest and that he would be "walking out" of the office that day[1]; (4) the interview lasted only 30 minutes; and (5) the troopers did not use overt coercion—*i.e.*, their tone was not hostile, they did not display weapons or physically restrain him, and the door to the office was unlocked at all times. None of these findings is clearly erroneous.

---

[1] Although the troopers did not explicitly tell Mr. Ingino he was "free to leave," they did not have to speak magic words for it to be clear that he was not under arrest and was free to leave. The issue is whether the facts and circumstances would suggest to a reasonable person in his shoes that he was not free to leave. At the start of the interview, one trooper told Mr. Ingino that they would leave their contact information with him following their conversation. And both troopers repeatedly reminded him that regardless of his answers, he would be "walking out." App. 146–47, 210. These statements suggest the interrogation would not end with Mr. Ingino in handcuffs.

On appeal, Mr. Ingino emphasizes that the troopers improperly took advantage of his compelled presence in the probation office.[2] But because the mandatory probation meeting had ended *before* the troopers' questioning, the subsequent interrogation was not part of that mandatory meeting. The troopers were not in the probation office when Mr. Ingino arrived or when he took the required drug test. And the probation officer testified that the troopers' interrogation started only *after* she informed Mr. Ingino that he had violated his probation and could expect a summons—meaning that the probation meeting had finished. Only then did the probation officer inform Mr. Ingino privately that the troopers wanted to speak with him. While she admitted she did not tell him whether he *needed* to speak with the troopers, she testified that he said "Okay" in response and did not demonstrate any resistance to the idea of speaking with them. Furthermore, the probation officer did not participate in the later interrogation—which might otherwise suggest that the troopers' questions were part of the probation meeting.

Considering the totality of the circumstances—the brief duration of the interview, the lack of overt coercive tactics, and being told that no matter what, "you[ are] walking out," App. 210—the District Court did not err in holding that Mr. Ingino was not in custody under the classic factors.

We pause briefly to consider a handful of other, less-compelling arguments that Mr. Ingino also raises. He claims he was ambushed by the troopers into a surprise

---

[2] A probation meeting alone is not custodial for *Miranda* purposes. *Minnesota v. Murphy*, 465 U.S. 420, 431-33 (1984). Rather the argument is that the troopers took advantage of the *Murphy* 'exception' to get Mr. Ingino to talk.

interview. But the evidence introduced at the hearing dispels such an argument. Indeed, he admitted in the interview that he knew the troopers were trying to reach him to discuss one of the overdoses. So that could not have been coercive here.

Likewise, Mr. Ingino's claim that the troopers verbally intimidated him does not cross the line into coercion. The troopers informed him that federal prosecution would likely yield a greater sentence than he would face in the state system, and the length of a possible sentence was in some respects dependent on his willingness to answer the troopers' questions. Yet these statements were either readily obvious or already known to Mr. Ingino, a person whose criminal history shows his familiarity with the criminal-justice system. Plus, "[i]t is appropriate for an investigator to advise a suspect of the potential course and consequences of a criminal investigation. Suspects frequently confront difficult decisions about whether to defend against potential criminal charges or to pursue resolutions that may ameliorate certain unpleasant consequences." *United States v. Czichray*, 378 F.3d 822, 829 (8th Cir. 2004). In other words, discussing future arrest and criminal penalties "is part and parcel of the interrogation process." *Id.* (quoting *United States v. LeBrun*, 363 F.3d 715, 721 (8th Cir. 2004). The statements here fit squarely within these acceptable areas of inquiry.

Finally, Mr. Ingino's argument that his statements were involuntary because he was under the influence of drugs during the interview cannot carry the day. It is true that his earlier drug test was positive and that one of the troopers said that he "didn't look too hot." App. 208. But the District Court credited the testimony of the two troopers and the probation officer who, in their respective lines of work, are familiar with the symptoms of

7

someone under the influence, and each stated that Mr. Ingino did not seem like he was under the influence. (The troopers also testified that they were unaware during the interview that he had failed his earlier drug test.) And the District Court found, from both the transcript and the interrogation recording, that he was coherent, articulate, and able to answer questions with specificity throughout the interview. Mr. Ingino raises no new grounds to disturb these findings.

*　　*　　*

Even if the troopers questioned Mr. Ingino following his probation meeting because they knew he would be present there, the mandatory probation meeting had concluded before the troopers spoke with Mr. Ingino. Moreover, Mr. Ingino assented to their request for an interview, which lasted only 30 minutes. And the troopers did not use coercive tactics. Based on the duration and nature of questioning, it was objectively reasonable for Mr. Ingino to feel free to leave. So he was not "in custody" during this interview. The Court will thus affirm the Order of the District Court, denying the motion to suppress.