**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1206
_____

UNITED STATES OF AMERICA

v.

SAMUEL ELIAS PENA COLUMNA,
Appellant
_____

On Appeal from the United States District Court
of the Virgin Islands
(No. 3-19-cr-00065-001)
U.S. Chief District Judge: Honorable Robert A. Molloy
_____

Argued
May 16, 2024
_____

Before: JORDAN, SHWARTZ, and BIBAS, Circuit Judges.

(Filed: September 13, 2024)
_____

Joseph A. DiRuzzo, III [**ARGUED**]
Daniel M. Lader
Margulis Gelfand DiRuzzo & Lambson
401 E Las Olas Boulevard
Suite 1400
Ft. Lauderdale, FL 33301

Michael L. Sheesley
Condo Torre Del Mar
1477 Ashford Ave.

Apt. 2201
San Juan, PR 00907

Counsel for Appellant Samuel Elias Pena Columna

Adam Sleeper [**ARGUED**]
Delia L. Smith
Office of United States Attorney
5500 Veterans Drive
United States Courthouse, Suite 260
St. Thomas, VI 00802

Counsel for Appellee United States of America

———————————

OPINION[*]

———————————

SHWARTZ, Circuit Judge

Defendant Samuel Pena Columna appeals the District Court's order denying his motion to suppress his statements to law enforcement and granting the Government's request to admit Rule 404(b) evidence. For the reasons set forth below, we will affirm.

I

A

On September 25, 2019, Defendant drove Juan Nolasco, Rammer Morales, and two other men in his jeep to a trailhead on St. John. The jeep contained over $1 million, which Defendant retrieved from St. Thomas earlier that day, and two weapons: a Glock with an extended magazine and a "long weapon," App. 836. The plan was to exchange the "long weapon" and money for 100 kilograms of cocaine. App. 836.

———————————

[*] This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

United States Customs and Border Protection ("CBP") Agents were monitoring the trail, which was known for drug smuggling. After the jeep arrived, Morales and Nolasco walked down the trail with the weapons to confirm that the drugs arrived. When two of the Agents attempted to stop them, the men shot one of the Agents. The Agents shot back, injuring Morales. Nolasco fled on foot and Defendant drove away with the two other men.

The next day, DEA Special Agents Brett Ashley and Evan Martinez, and FBI Task Force Officer Richard Dominguez, interviewed sources on St. John, beginning with Defendant. Defendant had been an FBI and DEA informant since May 2017. To ensure that they could meet with Defendant alone, the Agents created a ruse, asking him to go to a specific location, and once they saw him alone in his car, they called and asked him to pull over. After Defendant pulled over, Dominguez and Ashley entered Defendant's car and instructed him to drive to a nearby grocery store parking lot. The Agents had met with Defendant in the same way in the past to obtain information.

Once they arrived, Martinez sat in the front seat, with Ashley and Dominguez in the rear. The Agents wore plain clothes and carried concealed firearms. They spoke with Defendant in his car for approximately forty-five minutes to one hour, with Dominguez serving as an interpreter because Defendant speaks only Spanish. Defendant remained in the driver's seat and was not handcuffed at any point.

The Agents asked if Defendant knew anything about the shooting, and he initially said that he heard about it from third parties. The Agents, who knew that a jeep was used in the crime and that Defendant both owned a jeep and was familiar with the trail (having

3

previously provided them information about it), asked Defendant where his jeep was and whether he lent it to anyone. Defendant became nervous talking about the jeep and stated that he lent it to the individuals involved in the shooting. The Agents suspected that he was more involved. Defendant eventually told them that (1) Nolasco approached him the day of the shooting with a job as a driver, (2) Nolasco and Morales had guns, and (3) after hearing gunfire, he drove away with the money and the two other men.[1]

The Agents then exited Defendant's vehicle, leaving him alone in the driver's seat with his car keys, and called the United States Attorney's Office to discuss whether they had enough evidence to arrest him. Approximately ten to fifteen minutes later, Dominguez and Ashley reentered Defendant's car and directed him to drive to a different parking lot but did not place him under arrest. The group then boarded a CBP boat to go to the FBI's St. Thomas office. Before boarding, Defendant was searched, but not placed in restraints or told that he was under arrest.

At the St. Thomas FBI office, Defendant was brought to an interview room where Ashley and Dominguez began an audio and video recording and advised him of his rights orally and in writing.[2] In response, Defendant asked whether he was working for the Agents or under arrest, and Dominguez responded that he was not under arrest.

---

[1] During this discussion, Defendant allowed the Agents to look at Defendant's phone, which they never returned to him.

[2] The video of the interview was offered into evidence at the hearing and the parties used a transcript that had both the Spanish words spoken and their English translation as a guide. On appeal, both parties cite and neither challenge the English translation of the transcript that was admitted at trial. Accordingly, we rely on that version of the transcript. In addition, we have reviewed the video, which conveys the intonation and cadence in which the statements were made.

Defendant then said that he had made a mistake and continued, "but . . . no, I think that if I am under arrest, I have the right to an attorney, right? If I'm under arrest." App. 206. Dominguez told him that he was not under arrest but that if he wanted to answer questions, he could do so with or without an attorney, and asked whether he wanted an attorney. Defendant then said that he "got in deeper" and "did it wrong," App. 206-07, and Dominguez interrupted him, saying that if he wanted to talk to the Agents, he needed to tell the Agents, "[y]es, I am going to talk to you without an attorney," and reminded him that "if you want an attorney, you can have an attorney," App. 207.

Defendant paused and eventually responded:

No, [U/I],[3] that if I'm under arrest, I need an attorney, I mean, even if afterwards, you know, the family can get me another one to . . . a main one, no? Because I'm already under arrest, and I used to work for you, right?

App. 208. The Agents then left the room for a few minutes and, upon returning, informed Defendant that he was under arrest for trafficking cocaine and re-read him his rights. When asked if he understood his rights, Defendant nodded. Dominguez then said that had the Agents not contacted Defendant, he would not have told them about the incident, and when Defendant said, "I never knew [the individuals shot] were feds," Dominguez said:

But better . . . hold on . . . hold on. If you want . . . if you want to talk to us, if you want to talk to us that's something else, but I already read you . . . I read you your rights, you have your . . . your rights and if . . . if you understand them, I want to talk to you, but that's if you want to."

---

[3] [U/I] means that the word was unintelligible to the transcriber.

App. 211.  Defendant continued to speak and further incriminated himself.[4]

B

A grand jury returned a seven-count indictment against Defendant, Nolasco, Morales, and others,[5] and Defendant moved to suppress the statements he made in the vehicle on St. John and at the FBI office in St. Thomas.  The District Court denied the motion.  As to the St. John statements, the Court found that Defendant was not in custody when he spoke with the Agents in his car, though it acknowledged that "[a]t a certain point the information certainly became incriminating," and that when they went from "generally incriminating" to "very incriminating," Defendant "arguabl[y]" "may not have been" free to leave.  App. 198.  As to the St. Thomas statements, the Court reasoned that although Defendant was in custody, there was "arguabl[y]" not a clear invocation of the right to counsel, and even if there was, Defendant subsequently waived his rights by insisting on continuing to talk.  App. 199.  The case proceeded to trial.

Before trial, Nolasco agreed to cooperate and informed the Government that he and Defendant had been dealing drugs together long before the September incident.  Before calling Nolasco as a witness, the Government informed the Court that it planned

---

[4] The video revealed that Defendant was calmly speaking with the Agents throughout the interrogation and sought to get them to agree that he participated as their informant.

[5] Defendant was charged with conspiracy to possess with intent to distribute cocaine (Count One), attempt to possess with intent to distribute cocaine (Count Two), possession of firearms in furtherance of a drug trafficking crime (Counts Three and Four), possession and discharge of firearms during and in relation to a crime of violence (Count 5), and assaults of Marine Interdiction Agents while they were engaged in their official duties (Counts Six and Seven).

to ask him about transactions that preceded September 25, 2019, to provide context about Defendant's involvement in the underlying offense. Defense counsel objected based on the Government's failure to provide Rule 404(b) notice. The Government countered that Nolasco's testimony was intrinsic evidence of the charged conspiracy but offered to limit the evidence to the September events (which included testimony about a test run on the trail the week before the September events) subject to the opportunity for rebuttal if Defendant opened the door to testimony about earlier events. The Court agreed and admitted the September events as evidence intrinsic to the charged offense.

The jury then heard testimony about, among other things, (1) the events on and surrounding September 25, 2019; (2) Defendant's informant agreement, including instructions he was given not to engage in criminal conduct without approval and payments he received; and (3) the statements he made on St. John and St. Thomas. Based on cross-examination of several witnesses, the Government asked the Court for permission to recall Nolasco to testify about his long-time drug partnership with Defendant to show that Defendant was a knowing participant in the charged offenses.

In support of its request, the Government filed written notice of the proposed testimony, which Defendant opposed. The District Court held that the evidence of Defendant's history of drug trafficking with Nolasco since September 2017 was admissible because: (1) Defendant "put at issue the good faith belief [] that he was working as a [c]onfidential informant at this time, and . . . didn't have the mens rea to knowingly enter into this conspiracy," App. 1212; and (2) Nolasco's proposed testimony "is relevant to show [Defendant's] knowledge . . . and to rebut the good faith belief that

7

he was doing this to gather information for law enforcement," App. 1212. The Court, however, precluded testimony about past firearms use, reasoning that it would be "unfairly prejudicial . . . without a more precise defense[] argument that [Defendant] didn't know guns would have been involved in this transaction." App. 1214.

Nolasco then testified that: (1) before September 2017, he and Defendant engaged in drug-trafficking with another individual until that individual cut them out; (2) around September 2017, the pair agreed to start their own drug-trafficking business; and (3) Defendant's role in their business included bringing money from St. Thomas to St. John and driving Nolasco (usually with the other men involved in the September events) to buy drugs. Both before this testimony was presented and during its final instructions, the Court instructed the jury about the testimony's limited purpose.

Defendant was convicted on all counts[6] and sentenced to 368 months' imprisonment. Defendant appeals the suppression and Rule 404(b) rulings. We address each in turn.

---

[6] This excludes Counts Two and Four, which the Government moved to dismiss with prejudice after jury selection.

## II[7]

### A[8]

#### 1

"In reviewing a motion to suppress, we review a district court's factual findings for clear error, and we exercise de novo review over its application of the law to those factual findings." United States v. Goldstein, 914 F.3d 200, 203 n.15 (3d Cir. 2019) (internal quotation marks omitted) (quoting United States v. Katzin, 769 F.3d 163, 169 n.4 (3d Cir. 2014)). Applying the clear-error standard when reviewing a motion to suppress, "we accept the District Court's findings unless we are 'left with the definite and firm conviction that a mistake has been committed.'" United States v. Ludwikowski, 944 F.3d 123, 130 (3d Cir. 2019) (quoting United States v. Howe, 543 F.3d 128, 133 (3d Cir. 2008)).

Under this standard, the District Court did not err in denying Defendant's motion to suppress the St. John statements. The Court had a factual basis to conclude that Defendant was not in custody at that time and thus was not entitled to warnings pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). To determine whether a defendant is in custody when being questioned by police we (1) identify the "circumstances surrounding the interrogation"; and (2) ask whether "a reasonable person [would] have felt that he . . . was not at liberty to terminate the interrogation and leave." Ludwikowski, 944 F.3d at

---

[7] The District Court had subject matter jurisdiction pursuant to 48 U.S.C. § 1612(a) and 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.
[8] Because we conclude that the District Court did not clearly err in any of its fact finding, we depart from our dissenting colleague's gloss on the facts.

9

131 (internal quotation marks and citations omitted)).  Several non-exhaustive factors

help with this determination, including:

> [(1)] the interview's location, physical surroundings, and duration; [(2)] whether he voluntarily participated; [(3)] whether he was physically restrained; [(4)] whether other coercive tactics were used, such as hostile tones of voice or the display of weapons; [(5)] [] whether the interviewee was released when the questioning was over[;] [(6)] whether the questioner believed the interviewee was guilty; [(7)] whether the interviewee was specifically told he was not under arrest; and [(8)] whether he agreed to meet knowing that he would be questioned about a criminal offense.

Id. at 132 (citations omitted).  We then "must ask the additional question [of] whether the

relevant environment presents the same inherently coercive pressures as the type of

station house questioning at issue in Miranda."  Id. (quotation marks and citation

omitted).  If so, then the defendant was in custody.  Id.

Here, several factors indicate that a reasonable person in Defendant's position

would not have felt that he could not terminate the encounter and leave.  Defendant spoke

with the Agents voluntarily for approximately forty-five to sixty minutes in his car while

parked in a public grocery store lot.  When the Agents initiated the meeting, Defendant

was not a suspect,[9] and throughout the discussion, he remained in the driver's seat,

retained the car keys, was unrestrained, and the Agents did not display their weapons.

Indeed, during Defendant's prior dealings with the Agents while serving as an informant,

---

[9] Even absent this impression, Miranda would not be triggered because the duty to provide Miranda warnings "arise[s] not because the defendant has become the focus of a potential indictment but because the government has in some meaningful way imposed restraint on his freedom of action."  United States v. Jaskiewicz, 433 F.2d 415, 419 (3d Cir. 1970); see also id. ("Miranda deals with governmental conduct toward persons whom the government has subjected to restraint.").

10

the Agents were armed and there is nothing in the record about their voice or demeanor that would have signaled a break from that course of dealing. To the contrary, the circumstances under which the conversation took place were like the many others he voluntarily had with law enforcement when they spoke to him for information gathering purposes.[10]

For this reason, among others, this case is unlike United States v. Jacobs, 431 F.3d 99 (3d Cir. 2005), where we concluded that an informant was in custody when she made incriminating statements and affirmed the district court's order granting the motion to suppress. Specifically, the defendant in Jacobs had been an informant for more than ten years. Id. at 102. When the defendant contacted law enforcement to report on "the biggest" dealer in the area, her handler began to suspect her involvement, given the level of detail she provided. Id. at 103. On the day the other participants were arrested, the FBI (1) "closed" her as an informant without telling her, id. at 103-04; (2) summoned her to the FBI and believed that she was guilty; (3) questioned her without telling her that she was under arrest and did so in an intimidating and confrontational way, including placing evidence of the scheme in her view; and (4) told her that they thought she was guilty. Id. at 107-08. Moreover, she felt obligated to appear because she incorrectly believed she was still an informant. Id. at 107. Here, in contrast, (1) the questioning took place in

---

[10] Moreover, after Defendant made his incriminating statements, the Agents left him alone in the driver's seat of his own car with his keys for ten to fifteen minutes. Although Defendant may have raised suspicion had he sped off, being left alone in one's own car with the keys is not the sort of treatment that someone in custody would receive. Cf. Ludwikowski, 944 F.3d at 132.

Defendant's car; (2) Defendant was contacted for information-gathering purposes because he was an active informant familiar with the area and not a suspect when the questioning began; (3) there is no evidence that the questioning was confrontational or intimidating or that specific interrogation tactics were used; and (4) while it is possible that Defendant felt obligated to meet and speak with the Agents, the record reflects that the meeting was voluntary. Thus, Jacobs differs from this case in material ways and so it does not govern.

For all of these reasons, we are not "left with the definite and firm conviction," Ludwikowski, 944 F.3d at 130 (internal quotation marks and citation omitted), that the District Court committed a mistake in concluding that Defendant was not in custody when he made the St. John statements and denied his motion to suppress them.

2

The District Court also properly denied Defendant's motion to suppress the St. Thomas statements because he did not unambiguously invoke his right to counsel. To invoke the right to counsel, a suspect must do so "unambiguously." Davis v. United States, 512 U.S. 452, 459 (1994). If "an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal[,]' . . . the police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his or her Miranda rights." Berghuis v. Thompkins, 560 U.S. 370, 381 (2010) (quoting Davis, 512

U.S. at 461-62).[11]  However, once a defendant unambiguously invokes his right to

counsel, questioning must stop "until counsel has been made available to him, unless the

accused himself initiates further communication, exchanges, or conversations with the

police."  Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).

Here, neither of the two statements that Defendant identifies unambiguously

invoked his right to counsel.  First, his statement, "I think that if I am under arrest I have

the right to an attorney, right?[,]" App. 206, followed a statement from Dominguez that

Defendant was not under arrest.  Thus, Defendant's comment appears to be an effort to

clarify his right to counsel rather than an assertion of that right.

The same is true of his second statement:

> No, [U/I] that if I'm under arrest, I need an attorney, I mean, even if
> afterwards, you know, the family can get me another one to . . . a main one,
> no?  Because I'm already under arrest, and I used to work for you, right?

App. 208.  Defendant made this statement after Dominguez told him that he was not

under arrest and that if he wanted to answer questions he could do so with or without an

attorney.  Thus, in this second statement, Defendant sought to clarify his rights,

expressing no more than his belief that if he was under arrest, he would need an

---

[11] See also Davis, 512 U.S. at 459-60 (explaining that if a suspect makes a reference that, "a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning" because "a statement either is such an assertion of the right to counsel or it is not," and such an extension of Edwards v. Arizona, 451 U.S. 477 (1981) would result in "irrational obstacles to legitimate investigative activity." (internal quotation marks and citations omitted)).

attorney.[12] Thereafter, the Agents left the room for a few minutes and when they returned, informed Defendant that he was under arrest, gave reasons why, and re-read his rights, thereby eliminating any possible confusion on Defendant's part about whether he was under arrest or had a right to counsel.[13]

Because the two challenged statements, at best, indicate that Defendant "might be invoking the right to counsel," as opposed to clarifying his rights, the Agents were not required to cease questioning. Davis, 512 U.S. at 459 (citation omitted). Accordingly, the District Court did not clearly err in finding that Defendant did not unambiguously

---

[12] In the dissent's view, this statement amounts to an invocation of the right to counsel because it "can reasonably be construed to be an expression of a desire for the assistance of an attorney." Dissent at 23-24 (quoting Davis, 512 U.S. at 459). However, under Davis, if a reasonable officer, given the circumstances, would only understand that the suspect "might be invoking the right to counsel," Davis, 512 U.S. at 459, the questioning need not cease. Thus, we can ignore neither Dominguez's exchange with Columna, which provides context for Columna's questions about his rights, nor that throughout the interview, Defendant continued to offer information to the Agents despite their lack of probing and frequent reminders about his rights. See, e.g., App. 206-07 (Dominguez interrupting Defendant after he said he "got in deeper," and "did it wrong," to say that if he wanted to talk, he needed to tell Agents, "[y]es, I am going to talk to you without an attorney," and remind him that "if you want an attorney, you can have an attorney"); App. 211 (Dominguez interrupting Defendant after he was placed under arrest and indicated that he understood his rights, stating "[h]old on. . . hold on. If you want . . . if you want to talk to us, if you want to talk to us that's something else, but I already read you . . . I read you your rights, you have your . . . your rights and if . . . if you understand them, I want to talk to you, but that's if you want to."). See Davis, 512 U.S. at 461-62 (recommending but not requiring clarification if it is unclear whether an individual invoked his right to counsel). The District Court therefore had good reason to view Defendant's continued statements as manifesting a waiver of his rights.

[13] Because, in our view, Defendant did not unambiguously invoke his right to counsel, it is not error to consider these actions.

invoke his right to counsel,[14] and thus it properly denied the motion to suppress the St. Thomas statements.[15]

## B[16]

The District Court also acted within its discretion to admit Defendant's history of drug dealing with Nolasco under Rule 404(b). Rule 404(b) prohibits admission of certain other-acts evidence, such as evidence offered to show a person's propensity to engage in certain conduct. See Fed. R. Evid. 404(b)(1).[17] "Other act" evidence, however, is admissible when offered for a proper purpose, "such as proving . . . intent . . . [or] knowledge." Fed. R. Evid. 404(b)(2).

Because Rule 404(b) is a rule of general exclusion, the proponent of the other-acts evidence must demonstrate that it (1) is "proffered for a non-propensity purpose"; (2) is "relevant to the identified non-propensity purpose"; (3) has probative value that is not

---

[14] Cf. United States v. Wysinger, 683 F.3d 784, 794-95 (7th Cir. 2012) (concluding that the statement "[d]o I need a lawyer before we start talking?" is not an unambiguous invocation); Diaz v. Senkowski, 76 F.3d 61, 63-64 (2d Cir. 1996) ("I think I want a lawyer" and "Do you think I need a lawyer?" are not clear invocations of the right to counsel); Mueller v. Angelone, 181 F.3d 557, 573-74 (4th Cir. 1999) (same).

[15] Any argument based on Missouri v. Seibert, 542 U.S. 600 (2004) (prohibiting agents from deliberately soliciting un-Mirandized statements and then seeking to re-elicit the same statements after providing Miranda warnings), is waived.

[16] Evidentiary rulings are reviewed for an abuse of discretion. United States v. Caldwell, 760 F.3d 267, 274 (3d Cir. 2014).

[17] Rule 404(b) does not apply to intrinsic evidence, i.e., evidence that (1) "directly proves the charged offense," or (2) demonstrates "uncharged acts performed contemporaneously with the charged crime [that] . . . facilitate the commission of the charged crime." See United States v. Green, 617 F.3d 233, 248-49 (3d Cir. 2010) (internal quotation marks and citation omitted). At oral argument, Defendant stated that he was not objecting to evidence about his September 2019 interactions with Nolasco. Oral Argument at 15:20-52, United States v. Columna, No. 23-1206 (3d Cir. May 16, 2024).

"substantially outweighed by its potential" to cause unfair prejudice under Rule 403; and (4) is "accompanied by a limiting instruction," if requested. United States v. Repak, 852 F.3d 230, 241 (3d Cir. 2017) (citations omitted). Likewise, the proponent must provide written pre-trial notice of the evidence. The notice requirement can be excused upon a showing of good cause. Fed. R. Evid. 404(b) advisory committee's note to 2020 amendment.

Here, Nolasco's testimony about his history of drug-dealing with Defendant was proffered for, and relevant to, a non-propensity purpose: to rebut Defendant's attempt to establish that he (1) was surprised by Nolasco's request to serve as the driver on September 25, 2019 and (2) reasonably believed that he was authorized by the Government to do so and lacked the mens rea to enter the September conspiracy. The District Court properly identified this purpose and articulated the chain of inferences linking the evidence to this purpose. The Court also engaged in Rule 403 balancing by (1) noting that Defendant "questioned law enforcement witnesses on [Defendant's] the course of conduct . . . with the DEA and FBI," and that there is testimony that Defendant was "warned at least on two occasions[] that engaging in any criminal activity could lead to prosecution," App. 1213; and (2) excluding the Government's proposed testimony concerning firearms, reasoning that such evidence "would be unfairly prejudicial to the defense based on the nature of these charges" in the absence of an "argument that

16

[Defendant] didn't know guns would have been involved in this transaction," App. 1213-14.[18]

Likewise, the District Court did not abuse its discretion in finding good cause to excuse the timing of the mid-trial notice because Defendant opened the door to the other-acts evidence when he elicited responses from the Government's witnesses that could allow "the jury [to] infer that his activities were pursuant to agreements with DEA or the FBI" dating back to May 2017, App. 1191; cf. Fed. R. Evid. 404(b) advisory committee's note to 2020 amendments (explaining that "[a] good cause exception for the timing . . . is necessary because" a "permissible purpose for the evidence may not become clear until just before, or even during, trial"). Furthermore, Defendant had adequate opportunity to assess the evidence and why it was being offered during the numerous side bars that occurred before the Court admitted it.

For these reasons, the Rule 404(b) evidence was admissible.

## III

For the foregoing reasons, we will affirm.

---

[18] The Court also provided limiting instructions, which minimized any unfair prejudice, and which the jury is presumed to follow, Richardson v. Marsh, 481 U.S. 200, 211 (1987), both before Nolasco was recalled to the stand and as part of its final jury instructions.

*United States v. Pena Columna*, No. 23-1206

_____

JORDAN, *Circuit Judge*, concurring in part, dissenting in part.

I agree with my colleagues' well-reasoned rejection of Pena Columna's argument that Federal Rule of Evidence 404(b) should have prevented admission of certain evidence in his case. I strongly disagree, however, with their conclusion that Columna's Fifth Amendment rights and associated protections under *Miranda v. Arizona*, 384 U.S. 436 (1966), were not violated. Hence this lengthy separate opinion in a non-precedential case. Columna's rights were violated in ways that were far from harmless, as I will endeavor to explain.

I.      **FACTUAL BACKGROUND**

On the evening of September 25, 2019, Columna, who had been a DEA confidential informant and thought he still was, drove a jeep to the top of a trailhead on the east side of the island of St. John in the U.S. Virgin Islands. In the car were four other men, along with guns and duffle bags filled with over $1 million in cash. When two of the men – Rammer Morales and Juan Nolasco – went down the trail to execute a drug transaction, gunfire erupted and two people were shot, one of whom was a federal agent.

The next day, two DEA agents, Evan Martinez and Brett Ashley, went to St. John with Virgin Islands police officer Richard Dominguez, who was working as an FBI Task Force Officer, (collectively, the "law enforcement agents" or "agents") to ask Columna whether he had any information about the shooting. Columna had been a confidential

1

informant for the FBI and DEA since 2017 and had previously been paid by Dominguez for information. In fact, Columna's status as a confidential informant was formalized in a series of written agreements, and he had been paid by the government for information just days before the shooting. When Columna met with the agents, they did not tell him that his information-sharing agreement with the government was no longer in effect, nor was he officially "deactivat[ed]" as an informant until after his arrest. In order to get Columna alone, without letting him know they were then on St. John, the agents came up with a ruse. They called him and told him they needed him to go to a bar as their informant and look for a certain individual.

Once the agents spotted Columna driving to the bar, they called him again, this time ordering him to pull over so they could speak with him. He complied, and Ashley and Dominguez then got into his car and directed him to drive to a parking lot "where there [was] some privacy."[1] Martinez followed in the agents' car. Once Columna was parked, Martinez joined the others in Columna's car. The agents wore plain clothes but all three were carrying concealed firearms, which Columna was likely aware of because, as one of their informants, he had met them before. Ashley also carried handcuffs on his belt. The agents told Columna to give them his cell phone and his passcode, which he did. They thus gained access to his phone and text messages, and they never returned the phone to him.

---

[1] Dominguez testified that "we told [Columna] to drive up behind [the] [m]arket. There is an upper parking lot up there where there is some privacy, so we told him to drive up into that parking lot so we [could] talk." (J.A. at 925.)

2

While in the car, the agents questioned Columna for approximately an hour. He does not speak English, so Dominguez, a Spanish speaker, served as translator. Columna was never told that he was free to leave, nor did he ask. He was not formally placed under arrest while in the car, and the agents later testified that he was not a suspect at the time the questioning began. They did not give him *Miranda* warnings.

At the outset of the questioning, Columna acknowledged that he had heard about the shooting, but only from third parties. The agents knew that a Jeep was used as a getaway car, that Columna owned a Jeep, and that he was familiar with the area involved in the drug deal. When the agents asked him where his Jeep was the night of the attempted drug transaction, Columna became nervous. Fifteen minutes into the conversation, he said that he had lent his Jeep to the people involved in the crime, but, as he became visibly more nervous, the agents suspected he had some involvement himself. They continued to question him, without reading him his rights, until he admitted his participation in the attempted drug deal.

After hearing the confession, the agents left his car and called the U.S. Attorney's office because, as one of the agents put it, they wanted to confer with a prosecutor "in order to make an arrest." (J.A. at 85.) When they were told they did have probable cause to arrest Columna, they determined they would eventually take that step. But they kept that bit of crucial information from him. Instead, Dominguez had Columna drive to another parking lot, where Dominguez parked the vehicle and kept the keys. The agents removed Columna from the car, searched him, and put him on a Customs and Border Patrol ("CBP") boat to the island of St. Thomas. Once on St. Thomas, they put Columna

3

in a government vehicle, and he was taken to the FBI's offices and put in an interview room.

Ashley and Dominguez eventually joined him in the room. They turned on video and audio recording equipment,[2] and Dominguez read Columna his rights in Spanish and presented him a form to sign to waive his rights. Columna declined to sign it. Instead, when Dominguez said, "Now that you understand your rights, do you still want to talk to us?", Columna responded by asking, "So, I'm under arrest?" (J.A. at 205.) Given all that had transpired, Dominguez's response is remarkable. "No," he said, "not yet." (J.A. at 205.) Columna again asked, "[A]m I still working for you guys or am I under arrest?" (J.A. at 205.) Despite having seized Columna's phone and car keys, having ushered him onto a government boat and then into a government car and then into an interview room in a government office, and having finally read him his *Miranda* rights, Dominguez kept up the pretense that there had been no arrest, telling Columna, "Presently you are not under … arrest." (J.A. at 206.) Columna then said, "I made a mistake … but … *no, I think that if I am under arrest, I have the right to an attorney, right?  If I'm under arrest.*" (J.A. at 206 (emphasis added).)

Instead of stopping him there, the agents let the conversation roll. Columna repeated that he thought he was working for the agents. He started to describe getting in deeper with drug trafficking, but Dominguez cut in, saying: "[I]f you want to talk to us,

---

[2] The recording was admitted into evidence at the suppression hearing and trial. The transcript and Spanish-to-English translation were also entered into evidence. All quotes come from the translated transcript.

we need you to say, 'Yes, I am going to talk to you without an attorney.' If you want an attorney, you can have an attorney." (J.A. at 207.) Then, in a comment that shows the agents understood exactly what they were trying to do – namely, to rinse the taint of unconstitutional acquisition from the incriminating information they'd already elicited from Columna – Dominguez said, "The conversation we're going to have is the same as the one we already had." (J.A. at 207.) Dominguez took a moment to translate the conversation for Ashley while Columna sat in silence. After a long pause, Columna said, "No, [unintelligible] *that if I'm under arrest, I need an attorney*, I mean even if afterwards, you know, the family can get me another one to … a main one, no? Because I'm already under arrest, and I used to work for you, right?" (J.A. at 208 (emphasis added).)

At that point, Dominguez left the room, with Ashley following shortly thereafter. Eight minutes passed before they reentered the room. Columna was silent while the agents were out. Upon reentry, Dominguez told Columna, "So this is where we are … now you're under arrest, OK?", and Dominguez reread him his rights. (J.A. at 209-10.) Columna nodded that he understood, and Dominguez continued talking, telling Columna that the crime happened because of choices Columna had made, choices unrelated to his role as an informant. Dominguez then asked a series of questions, such as "what was your job? To deal drugs?" (J.A. at 212.) Columna proceeded to speak to the agents about his belief that he was acting as an informant and, in the course of his response, corroborated his involvement in the events of September 25. The interview thus ended with a recorded confession, verifying the confession made on St. John. Columna was

5

indicted for seven crimes related to the events the day before. He pled not guilty to all counts, and filed a motion to suppress the statements he made to the law enforcement agents.

At the suppression hearing that was held later, Dominguez insisted that, when on St. John, Columna "was not under arrest[,]" which was why they did not advise him of his *Miranda* rights.[3] (J.A. at 128.) He also acknowledged that Columna was told he was not under arrest when given his *Miranda* rights the first time on St. Thomas. Dominguez admitted that he continued to ask Columna questions after Columna asked for a lawyer.

Later in the hearing, Columna's defense counsel obtained a bit of candor from Dominguez. Referring to when Columna had said, "I think if I'm under arrest I need a lawyer[,]" counsel asked, "there is no question at that point that he is asking for a lawyer, correct?" (J.A. at 161.) Dominguez replied simply, "That's correct." (J.A. at 161.) And yet, when asked if the agents "permit[ted] [Columna] to contact a lawyer[,]" Dominguez said, "Yes, he was permitted to. He didn't ask to contact a lawyer. … I didn't have one in my pocket. But we would have gotten a lawyer if he needed one." (J.A. at 162.) Columna's counsel then asked what occurred when the agents left the room for eight minutes and, once more admitting there had been an invocation of counsel, Dominguez responded that Columna "*had asked for a lawyer* and we were done talking to him. The next step for us was we were going to place him under arrest" to "work the case from

---

[3] Ashley also testified for the government, but, because Columna only speaks Spanish and Dominguez translated on both St. Thomas and St. John, Ashley's testimony was truncated by the Court because Ashley did not understand the conversation, only Dominguez's translations.

another angle." (J.A. at 164, 166 (emphasis added).) Perhaps thinking better of those admissions, Dominguez later contradicted himself again and said Columna "never asked for a lawyer." (J.A. at 174.)

Following Dominguez's testimony, the government conceded that, once Columna had been put on the CBP boat and taken to St. Thomas, he was in custody. As a result, the District Court stated that "[Columna wa]s under arrest when he [wa]s in St. Thomas." (J.A. at 184.)

Nevertheless, the District Court denied Columna's motion to suppress the September 26 statements, holding that he was not under custodial interrogation when on St. John. The Court said it was "arguable" that Columna was not free to leave "when he first uttered the very incriminating statement[s]" about his involvement,[4] and it was "objectively reasonable to conclude that he wasn't free to leave after the agents … had consulted" the U.S. Attorney. (J.A. at 198-99 ("[S]aying you're not under arrest [does not] mean[] that you're free to leave. It's an objective decision.").) And yet the Court decided against suppressing the St. John confession.

It then turned to the St. Thomas part of the controversy and held that Columna had not invoked his right to counsel, because it was "arguable that [the invocation of counsel] was not [clear] [t]here[,]" and, even if it had been clear, he waived it by continuing to

---

[4] More specifically, the Court noted that Columna's statement, "'I took these individuals after the shots and I took them to Cruz Bay,' or wherever he took them, [was] more incriminating than anything that was uttered before." (J.A. at 193 (paraphrasing Columna's confession).)

7

speak to the officers. (J.A. at 199-200.) So, with the government having the two confessions in its pocket, the case proceeded to trial.

During opening statements, the government told the jury of Columna's confessions on St. John and St. Thomas. Dominguez and Ashley specifically testified about Columna's admissions that he was involved in the September 25 attempted drug transaction. And again during closing arguments, the government highlighted Columna's confession on St. John and his corroboration of that confession once he was on St. Thomas.

The jury found Columna guilty of several crimes,[5] and the Court sentenced him to 368 months' imprisonment, with a term of supervised release and a fine. That brings us to this appeal.

## II.    DISCUSSION[6]

### A.    Columna's St. John Statements

In *Miranda*, the Supreme Court declared that the Fifth Amendment's prohibition against self-incrimination requires that, before custodial interrogation can proceed, an accused must be informed that he has the right to remain silent and the right to an attorney. 384 U.S. at 479. Should a defendant invoke either right, any interrogation has to stop. *Id.* at 474. The rule is firm, and, unfortunately, it was violated in this case. To

---

[5] Columna was charged with seven counts, two of which were dropped.

[6] We review the court's denial of a motion to suppress for clear error as to facts and give de novo review to the application of law to facts. *United States v. Davis*, 726 F.3d 434, 439 (3d Cir. 2013). "[H]armless-error analysis [i]s applicable to the admission of involuntary confessions[.]" *Arizona v. Fulminante*, 499 U.S. 279, 312 (1991).

8

begin with, although my colleagues correctly state the law we are to apply to determine whether a defendant is in custody, they misapply it to conclude that, while on St. John, "[Columna] was not in custody … and thus was not entitled to warnings pursuant to *Miranda v. Arizona*[.]" (Maj. Op. at 9.)

> 1. *Custody*

To determine whether an individual was in custody and therefore entitled to *Miranda* warnings before interrogation, the Supreme Court has prescribed "'[t]wo discrete inquiries … first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and leave.'" *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). "[T]he court must apply an objective test to resolve the ultimate inquiry: was there a … restraint on freedom of movement of the degree associated with a formal arrest." *Id.* The question of custody is tightly connected to the question of interrogation, since whether one feels free to walk away from a police officer is very often influenced by whether one is being questioned by the officer. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

My colleagues in the majority write that "a reasonable person in Defendant's position would not have felt that he could not terminate the encounter [on St. John] and

9

leave." (Maj. Op. at 10.) I have a very different view of what a reasonable person in Columna's position would have felt. As I understand this record, nothing "indicates that the[ agents] would [] have heeded a request to depart or to allow the suspect to do so." *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006). The "[n]umerous factors" laid out in our decision in *United States v. Ludwikowski*, 944 F.3d 123, 132 (3d Cir. 2019), support my view. Those nondispositive and nonexhaustive factors include:

> the interview's location, physical surroundings, and duration; whether [the defendant] voluntarily participated; whether he was physically restrained; whether other coercive tactics were used, such as hostile tones of voice or the display of weapons; and whether the interviewee was released when the questioning was over. We also consider whether the questioner believed the interviewee was guilty; whether the interviewee was specifically told he was not under arrest; [] whether he agreed to meet knowing that he would be questioned about a criminal offense. … [and] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.

*Id*.

Those factors do not justify the outcome endorsed by the majority here, especially in light of another of our precedents, *United States v. Jacobs*, 431 F.3d 99 (3d Cir. 2005), the case from which we drew the *Ludwikowski* factors, 944 F.3d at 132. In *Jacobs*, we considered nine of the factors later stated in *Ludwikowski*. The question we faced was whether a former FBI informant was in custody when questioned by her case handler about her part in a series of drug offenses. *Jacobs*, 431 F.3d at 102. We concluded she was in custody because (1) the questioning took place at the FBI office; (2) her handler believed she was guilty; (3) she was summoned without explanation; (4) the questions were "confrontational and intimidating"; (5) interrogation tactics were used (such as

10

keeping her away from her son); (6) her handler told her that he thought she was guilty; (7) she was reasonably under the impression that she was still an informant; (8) she was not specifically told she was *not* under arrest before questioning; and (9) she did not agree to meet "with knowledge of the fact that questioning about a criminal offense would take place." *Id.* at 107. After considering each of those factors, we determined that she was in custody, despite the fact that she "left the interview without hindrance." *Id.* at 106. We emphasized that her handler did not inform her of the reason they needed to meet and that she was "led to believe she was still an informant and thus likely felt an obligation to follow the directions of her handler, particularly because [he] had paid her before[.]" *Id.*

The pertinent facts in *Jacobs* closely track the facts here and compel me to say that Columna was in custody when he was questioned in his car on St. John. Perhaps the most important factor here, which was also of high importance in *Jacobs*, is evidence that the defendant "likely felt an obligation to follow the directions of [his] handler[s.]" *Id.* Columna was under the impression that he was still an informant and was being questioned by agents of a government that had paid him for information just days before. Indeed, the law enforcement agents reinforced that impression, as the entire interaction began with their directing him to go in his capacity as an informant and look for someone at a bar.[7] Therefore, "while [Columna] was not physically forced to [park his car in the

_____

[7] My colleagues in the majority state that Columna had met with the agents "in the same way in the past to obtain information." (Maj. Op. at 3.) That is not so. Ashley testified that they "had met [Columna] kind of in a similar location, in a parking lot at times," "[i]n vehicles[,]" and in "a similar circumstance[.]" (J.A. at 113-14.) There is no

11

parking lot], h[is] decision to go cannot fairly be said to have been 'voluntary,'" despite the majority's best efforts to say otherwise. *Id*.

The need for *Miranda* warnings is even greater when, as here, there is a previous relationship of trust. We have held that an "acquaintanceship" between an officer and suspect "increased rather than decreased the importance of *Miranda* warnings. … No suspect needs *Miranda* warnings more than one questioned by a law enforcement officer that the suspect assumes is a quasi-confidante." *United States v. Brownlee*, 454 F.3d 131, 147 (3d Cir. 2006). Columna had an informant relationship with the DEA and with Dominguez for two years. He felt comfortable speaking with them, and the agents testified to their belief that Columna was still under the impression he was an informant at the time they were questioning him.

Also, as in *Jacobs*, the agents here believed that the defendant was involved in the crimes they were investigating. Due to his knowledge of the trail and because a Jeep that looked like his was at the scene, the agents very quickly suspected Columna knew a lot more about the attempted drug deal and related shooting than he initially admitted. Again, consistent with *Jacobs*, Columna was "summoned … without explanation[.]" *Jacobs*, 431 F.3d at 105. While he believed he was going to a bar to gather information the agents wanted, he was instead being deliberately isolated for questioning. It is a painful stretch to say that Columna voluntarily agreed to meet with the agents to discuss

_____

evidence in the record, however, that Columna had been previously deceived by the agents in order to isolate him and effectuate a meeting. Nor is there evidence that Columna had met with all three armed officers, together, in a car before.

12

his criminal activity. The agents fooled him into an interview and at no point indicated that he was free to leave.

Once they had him alone in a secluded parking lot, they began their questioning. And make no mistake: interrogation tactics were used. Columna was forced to sit in the vehicle for an hour with three armed agents. When "law enforcement personnel far outnumber the suspect, [he] may reasonably believe that, should he attempt to leave, he will be stopped[.] … In short, the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home [or vehicle] a police-dominated atmosphere." *United States v. Craighead*, 539 F.3d 1073, 1084-85 (9th Cir. 2008). The seizure of the cell phone and its passcode also was significant because it communicated to Columna that he might as well talk since they now held key evidence about him. *Cf. id.* at 106 n.8 (acknowledging that "displaying evidence to a suspect is an interrogation technique" used "in the hopes that [the suspect] w[ill] … tell [officers] everything that [he or she] knew" (internal quotation marks omitted)). And, of course, it is hard to imagine that Columna felt that he could have asked for his phone back and for the agents to leave his car without jeopardizing his status as an informant and being arrested. In the circumstances in which Columna was placed by the agents, a reasonable person would not have felt free to terminate the interaction and leave.

I acknowledge that Columna was not questioned at a station house, that there is no evidence of a hostile tone of voice in the agents' questioning, and that the agents may not have suspected him, initially. But none of that makes *Jacobs* inapposite, despite the majority's attempt to wave it away. Even if *Jacobs* could be partially distinguished on

13

some facts, the rest sustain the analogy, as do several other *Ludwikowski* factors. 944 F.3d at 132.

For example, while Columna was in his own car, the agents directed him to park in a specific area in a secluded parking lot and questioned him in close quarter for almost an hour. The majority repeatedly lists Columna being in his own car as a factor demonstrating that he was not in custody. But "one can be 'in custody' so as to require Miranda warnings even in one's own home." *United States v. Scott*, 590 F.2d 531, 533 (3d Cir. 1979). "More important than the familiarity of the surroundings where [Columna] was being held is the degree to which the police dominated the scene." *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996); *see also United States v. Griffin*, 922 F.2d 1343, 1354-55 (8th Cir. 1990) ("Questioning which occurs in the suspect's own home may provide a margin of comfort, but … the setting of the interrogation is not so important to the inquiry as the question of police domination of that setting."). Columna was surrounded, in a small, enclosed space, by three armed law enforcement officers and, while under suspicion, closely questioned at length. That certainly looks like custodial interrogation.

The majority opinion tries to avoid that conclusion by saying that "the Agents left [Columna] alone in the driver's seat of his own car with his keys for ten to fifteen minutes." (Maj. Op. at 11 n.10.) While admitting that Columna "may have raised suspicion had he sped off," my colleagues assert that the agents' huddling to the side of his car is somehow different than "the sort of treatment that someone in custody would receive." (Maj. Op. at 11 n.10.) I can't agree with that rosy interpretation. It ignores that

14

a reasonable person will rightly feel he is not permitted to leave when he knows that the law enforcement officers who have secluded him want him to stay put. *See United States v. Jones*, 846 F.2d 358, 361 (6th Cir. 1988) (holding that defendant was in custody after driving himself, while being escorted by two police cars, home and told to stay in his car alone while they searched his apartment). As the Supreme Court has observed, "[c]ertainly few motorists would feel free either to disobey a directive … or to leave the scene … without being told they might do so." *Berkemer v. McCarty*, 468 U.S. 420, 436 (1984).

The tether holding Columna in place here was further strengthened by the seizure of his phone. "Modern cell phones are not just another technological convenience. … According to one [2013] poll, nearly three-quarters of smart phone users report being within five feet of their phones most of the time[.]" *Riley v. California*, 573 U.S. 373, 395, 403 (2014). How many people would feel free to drive away from an encounter with law enforcement, leaving their phone with the government agents who took it along with its pass code? Very, very few. Contrary to the majority's assertions, a reasonable person in Columna's position would not have felt free to leave. (*Contra* Maj. Op. at 10); *cf. Ludwikowski*, 944 F.3d at 133 (finding no custody when "unlike a suspect, [the defendant] had his phone, which he perused and used to make a call").

The majority also states that Columna "was unrestrained[.]" (Maj. Op. at 10.) I disagree and think that, from the moment the agents entered his car, Columna was very effectively restrained. Black's Law Dictionary defines "restraint" as "[c]onfinement, abridgement, or limitation[.]" *Restraint* (def. 1), *Black's Law Dictionary* (11th ed. 2019).

15

Columna was confined to his vehicle and limited by the agents directing his movements and location. That restraint does not change just because, at first, he was the one operating the vehicle.

Restraint became custody at least from the moment he became the object of high suspicion and more aggressive questioning on St. John. That is evident from what happened. The agents proceeded to question him more closely and elicit more incriminating information, and they then called the U.S. Attorney to get confirmation that they could make an arrest. He was definitely not free to leave once that began, and the reality of custody became more obvious over time, as the agents' own actions amply demonstrate. They directed Columna to drive his car to the docks; Dominguez then parked Columna's car and kept his keys and phone; Columna was searched and placed on a CBP boat; he was brought to St. Thomas, where he was driven in a police car to FBI headquarters; once there, he was placed in an interview room and formally interrogated and eventually told he was under arrest. Therefore, even if we were to conclude that the initial questioning in the car was mere "information gathering" (J.A. at 198), shortly into the conversation in the parked car, when the agents decided that Columna was a suspect and they sought to obtain incriminating evidence from his own mouth, the Fifth Amendment was in play. No reasonable person would have felt free to leave. Columna was, in short, in custody for *Miranda* purposes.

The majority opinion, however, concludes that the District Court "did not clearly err in any of its fact finding," and thus, they say, it correctly "found that Defendant was not in custody when he spoke with the [a]gents in his car[.]" (Maj. Op. at 9 n.8, 12.)

16

Yet, "[w]hether a person was 'in custody' for the purposes of *Miranda* [is a] conclusion[] reviewed *de novo*." *Jacobs*, 431 F.3d at 104 (reviewing the underlying factual findings for clear error); *cf.* (Maj. Op. at 9 (discussing the district court's "factual basis to *conclude*" that Columna was not in custody (emphasis added)). Applying that standard, I would hold that Columna was in custody.

And, regardless, to the extent the District Court's decision rested on fact finding, which we review for clear error, I am also "left with the definite and firm conviction," *Ludwikowski*, 944 F.3d at 130, that the Court "committed a mistake in concluding that [Columna] was not in custody when he made the St. John statements[.]" (Maj. Op. at 12.)

### 2. Interrogation

Because my colleagues hold that Columna was not in custody, they do not ask whether the agents interrogated him such that *Miranda* warnings were required. There is, however, no need for assumption. It is plain that Columna was interrogated.

"The interrogation necessary to trigger the need for *Miranda* warnings is not limited to the quintessential station-house police interrogation." *Saranchak v. Beard*, 616 F.3d 292, 302 (3d Cir. 2010*).* We must look to whether the agents intended to "actually elicit[] statements" and whether the meeting "'contain[ed] inherently compelling pressures which work[ed] to undermine [Columna's] will to resist and to compel him to speak where he would not otherwise do so freely.'" *Id.* at 303, 305 (some alterations in original) (quoting *Miranda*, 384 U.S. at 467). And "[a]ny knowledge the police [have] concerning the unusual susceptibility of a defendant … might be an important factor in

17

determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response[.]" *Innis*, 446 U.S. at 301 n.8.

The agents' questions to Columna in the car were designed to elicit incriminating responses. There is no plausible denial of that. While they may have begun by asking routine questions about the shooting because (they claim) they did not initially believe Columna was a suspect, when they began to ask him about his Jeep's location the night before, the questions were aimed at gaining a confession. We don't have to guess about their intent; they owned up to it. They testified at the suppression hearing that, due to his nervousness, they suspected Columna was involved in the crimes and began to press him for admissions.[8] We have observed that, "[t]he more cause for believing the suspect committed the crime, the greater the tendency to bear down in interrogation and to create the kind of atmosphere of significant restraint that triggers *Miranda*[.]" *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974). That occurred here, and the agents got what they were after: enough of a confession to formally arrest and charge Columna.

Despite that, the District Court held that the meeting was merely "information gathering[,]" and the majority endorses that conclusion. (J.A. at 198.) To me, it seems a long way from what actually happened and the protection that *Miranda* is meant to afford. *See In re Gault*, 387 U.S. 1, 49 (1967) (protection of *Miranda* turns "upon the nature of the statement or admission and the exposure which it invites"). Even if we

---

[8] For example, Dominguez testified that, at that point, he "began asking [Columna] questions with the intention of getting more information from him related to his involvement in the events on September 25[.]" (J.A. at 144); *see also infra* note 8.

18

were to ignore all the circumstances that show the agents had shifted from gathering information from an informant to interrogating a suspect, we cannot ignore their own statements showing they were trying to get Columna to incriminate himself. Under oath at the suppression hearing, Dominguez said, "Eventually, we got down to the fact that there was a jeep that was used in the commission of this crime and we know that [Columna] owns a jeep. And we asked him specifically, … where was your jeep? Did you lend it to anybody?" (J.A. at 123.) Dominguez continued, "[W]e asked [him] more questions about the jeep[.] … We suspected that there was more involvement. And eventually, he tells us, okay, he actually drove them to the shooting in his own jeep." (J.A. at 123.) The agents "continued to talk to him" after that admission for about 45 minutes until they learned the full story. (J.A. at 124-25, 175.) At that point, Dominguez testified that they "wanted to move the interview … to [the FBI] office … to make sure [they] got all the details correct, knowing that [they] would have the ability to audio and video record at that point." (J.A. at 129.) As Dominguez put it, they "*continued* the interview in the [FBI office's] interview room." (J.A. at 129 (emphasis added); *see also* J.A. at 131 (Dominguez testified that he "want[ed] to advise [Columna] of [his] right [to counsel] so [they] c[ould] continue the interview").) On cross, Dominguez also testified that he "suspected [Columna] had more information … to do with the shooting that … occurred … [a]and so, [he] continued to ask him questions[.]" (J.A. at 143.)

In short, Dominguez conceded that, while still on St. John, he "ask[ed] [Columna] questions with the intention of getting more information from him related to his involvement in the events on September 25[.]" (J.A. at 144.) And, referring to the

19

interrogation on St. Thomas, Dominguez testified that "[Columna] basically just went over the same details he had given us already." (J.A. at 130.) That confirms the statement he made to Columna during the St. Thomas interrogation: "The conversation we're going to have is the same as the one we already had [on St. John]."[9] (J.A. at 207.) Those statements are plain admissions that, during the interrogation on St. John, the agents used "words or actions" they "kn[ew] [were] reasonably likely to elicit an incriminating response[.]" *Innis*, 446 U.S. at 300-01. In other words, they subjected Columna to custodial interrogation.

Putting it all together, the agents' actions on St. John exemplify why *Miranda*'s prophylactic rule exists and how it protects citizens' Fifth Amendment rights against self-incrimination. The District Court should have suppressed the statements Columna made on St. John. *Oregon v. Elstad*, 470 U.S. 298, 307 n.1 (1985) (requiring suppression of unwarned statements).

### B. Columna's St. Thomas Statements

Once a suspect invokes his right to counsel, *Miranda* declares he "has a … right to have counsel present during custodial interrogation." *Edwards v. Arizona*, 451 U.S. 477,

---

[9] *See also* Ashley's suppression hearing testimony, (J.A. at 84-85 ("Based on … what the defendant had said [in the car] we had enough, we felt like, that he incriminated himself and was involved in the incident. … At that point we felt like we had enough to make an arrest."), 106 (testifying to the fact that "as we spoke to him longer we started getting more and more information" until "we thought that … we needed to confer with the U.S. Attorney and let them know what we had gathered")), and Dominguez's other statements during Columna's interrogation on St. Thomas referring to the agents' questioning on St. John, (J.A. at 204 ("We had to move you for various reasons … [including that] it's too much information and it's very important that we have everything clear[.]")).

482 (1981).  Even the government admits that Columna was subject to custodial interrogation in the interview room at the FBI office on St. Thomas.  Unlike my colleagues in the majority, I believe that Columna clearly invoked his right to counsel at that time, and the agents failed to honor it.

### 1. Invocation of Right to Counsel

"Invocation of the *Miranda* right to counsel 'requires … some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'"  *Davis v. United States*, 512 U.S. 452, 459 (1994) (quoting *McNeil v. Wisconsin,* 501 U.S. 171, 178 (1991)).  The bar is not as high as the majority here makes it out to be.  Despite my colleagues' insistence on great clarity, the Supreme Court has never required that a suspect "'speak with the discrimination of an Oxford don.'"  *Id.* (quoting *id.* at 476 (Souter, J., concurring)).  True, "he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand … [the] request for an attorney."  *Id.*  But that amounts to a standard of reasonable clarity, not perfect clarity.  In determining whether there has been an invocation of the right to counsel, we must look only to "the request for counsel or the circumstances leading up to the request" to determine whether it was ambiguous; "an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself."  *Smith v. Illinois*, 469 U.S. 91, 98, 100 (1984).

The majority might be right – and I emphasize "might" – that Columna's first attempt to invoke his right to counsel – "I think that if I am under arrest, I have the right

21

to an attorney, right?  If I'm under arrest." – was insufficient.  *Cf. United States v. Wysinger*, 683 F.3d 784, 795 (7th Cir. 2012) ("'Do I need a lawyer?' … indicates that the asker is contemplating whether he is in need of the services of a lawyer[.]").  But we don't need to decide whether, on its own,[10] that first request was enough to put the agents on notice because Columna's second request surely was sufficient, especially in light of the full circumstances of the conversation.

Following Columna's first mention of his right to counsel, Dominguez said:  "[I]f you want to talk to us, we need you to say, 'Yes, I am going to talk to you without an attorney.'"  (J.A. at 207.)  Columna answered, "No, [unintelligible] that if I am under arrest, I need an attorney, I mean, even if afterwards, you know the family can get me another one to … a main one, no?  Because I am already under arrest, and I used to work for you, right?"  (J.A. at 208.)  The English translation indicates Columna's grammar was less than perfect, but his statement was not less than clear.  Dominguez said, "we need you to say, 'Yes,'" and Columna's immediate response was "No," followed by a sensible explanation of why it was "no[.]"  (J.A. at 207-08.)  What is unclear about that?  His

---

[10] Columna's second invocation is further strengthened by the fact that he attempted to ask for an attorney the first time.  If insufficient on its own, the first statement would color a reasonable law enforcement officer's interpretation of the second.  *See Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir. 1999), *as amended* (Sept. 2, 1999) (holding that the suspect's "thrice-repeated questions [asking for an attorney], *when considered together*, constituted an unequivocal request for an attorney." (emphasis added)); *cf. United States v. Kelsey*, 951 F.2d 1196, 1198 (10th Cir. 1991) (holding that defendant "invoked his right to deal with the police through an attorney" when he "asked to see his lawyer three or four times").

22

words "can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis*, 512 U.S. at 459. That should be the end of the analysis.

The words, "I need an attorney," are particularly clear. Less clear invocations have been held to be unequivocal invocations of the right. *See, e.g.*, *United States v. Lee*, 413 F.3d 622, 626 (7th Cir. 2005) ("Can I have a lawyer?" is an unequivocal request for an attorney, requiring that police officers halt the interrogation; "I think I should call my lawyer," "Can I talk to a lawyer?" and "I have to get me a good lawyer, man. Can I make a phone call?" are also all unequivocal invocations of the right to counsel.). Again, we do not require exacting words to request counsel,[11] *Davis*, 512 U.S. at 459, but if we did, the statement "[I]f I am under arrest, I need a lawyer" would be a good candidate for the suggested language.

And after Columna declared, "I need an attorney," he added, "even if afterwards, you know the family can get me another one to … a main one, no?" (J.A. at 207.) I understand that statement as an effort to emphasize that he wanted counsel right then, in

---

[11] *See, e.g.*, *Shedelbower v. Estelle*, 885 F.2d 570, 573 (9th Cir. 1989), ("You know, I'm scared now. I think I should call an attorney[.]" was an invocation of defendant's right to counsel); *Owen v. Alabama*, 849 F.2d 536, 538–39 (11th Cir. 1988) (defendant's response to *Miranda* warning concerning right to counsel, "I think I'll let y'all appoint me one," was arguably a clear invocation of right to counsel which should be interpreted broadly); *United States v. Gotay*, 844 F.2d 971, 976 (2d Cir. 1988) (accused's statement that she could not afford a lawyer and was concerned about obtaining a lawyer was arguably a clear request for counsel, requiring that questioning cease); *White v. Finkbeiner*, 611 F.2d 186, 190 (7th Cir. 1979) (defendant's statement "I'd rather see an attorney" when asked if he wanted to talk constituted a request for counsel), *aff'd* 752 F.2d 540, 545 (7th Cir. 1985); *United States v. Clark*, 499 F.2d 802, 806 (4th Cir. 1974) (suspect's remark "I had better talk to a lawyer" constituted a request for counsel).

the moment, even if later he wanted to proceed with a different lawyer.  Despite the Spanish-to-English language barrier, there is nothing hard to understand here.  His requests and references to wanting a lawyer should have been enough to overcome any possible confusion about his desire for the assistance of counsel.  *Cf. United States v. Wysinger*, 683 F.3d 784, 795 (7th Cir. 2012) (holding that while "[i]n and of itself, [suspect's question] d[id] not constitute an unequivocal request for counsel. … [his] very next sentence clarified the request and removed all doubt as to his meaning").

Columna's prefatory clause – "if I am under arrest" – does not undermine his statement, "I need an attorney."  (J.A. at 208.)  The final proof of that is what the agents in fact understood from his words.  As Dominguez testified, Columna "had asked for a lawyer and we were done talking to him."  (J.A. at 164.)  Although Dominguez did a bit of flip-flopping, he was straightforward on cross examination when he agreed that Columna had asked for a lawyer.  Indeed, he agreed that Columna had unquestionably done so.[12]  (J.A. at 161; *see also* J.A. at 166 ("[A]t that time …, based upon what he was telling us, and the fact that he was not going to speak to us anymore, we figured that our only course of action was to place him under arrest and then go work the case from another angle.").)

---

[12] To reiterate, at the suppression hearing, Columna's counsel asked, "So there is no question at th[e] point [that Columna said, 'I think that if I'm under arrest I need a lawyer'] that he is asking for a lawyer, correct?"  To which, Dominguez replied, "That's correct."  (J.A. at 161.)

24

But, even if the prefatory clause made his request for an attorney conditional, Columna *was* under arrest at that point, satisfying the supposed condition. *See Arrest, Black's Law Dictionary* (11th ed. 2019) (defining "arrest" as "[a] seizure or forcible restraint, esp. by legal authority[,]" or "[t]he taking or keeping of a person in custody by legal authority, esp. in response to a criminal charge"). As the District Court stated at the suppression hearing, "[the government] concedes [that Columna was] under arrest when he [wa]s in St. Thomas."[13] (J.A. at 184.)

And yet to demonstrate that "any possible confusion on [Columna]'s part about whether he was under arrest or had a right to counsel" was "eliminated[,]" the majority erroneously considers statements and actions that occurred *after* Columna's request for an attorney. (Maj. Op. at 14 (noting that "*[t]hereafter*, the [a]gents left the room for a few minutes and when they returned, informed [Columna] that he was under arrest, gave reasons why, and re-read his rights").) My colleagues say "[b]ecause, in [their] view, [Columna] did not unambiguously invoke his right to counsel, it is not error to consider these actions." (Maj. Op. at 14 n.13.) They are mistaken. Supreme Court precedent expressly precludes analyzing post-request responses to determine whether a suspect has invoked his right to counsel: "[S]ubsequent statements are relevant *only* to the question whether the accused waived the right he had invoked." *Smith*, 469 U.S. at 98. "Using an

---

[13] The majority characterizes Columna's invocations as merely seeking to "clarify his rights, expressing … his belief that if he was under arrest, he would need an attorney." (Maj. Op. at 13-14.) But as discussed above, Columna *was* effectively under arrest – which the agents knew, even if he did not.

25

accused's subsequent responses to cast doubt on the adequacy of the initial request *itself* is … intolerable." *Id.* at 98-99. "Whether in the same interrogating session or in subsequent sessions, the so-called 'flavor' of an accused's request for counsel cannot be dissipated by continued police questioning." *Id.* at 98 n.7. That makes sense. It is circular to use words uttered after the statement in question to decide whether the statement itself was an invocation, when the determination that there was an invocation would preclude consideration of those same subsequent statements.[14] "Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together. The importance of keeping the two inquiries distinct is manifest. *Edwards* set forth a 'bright-line rule' that *all* questioning must cease after an accused requests counsel." *Id.* at 98.

In *Smith v. Endell*, the Ninth Circuit held that a defendant invoked his right to counsel when he asked, "Can I talk to a lawyer? At this point, I think maybe you're looking at me as a suspect, and I should talk to a lawyer. Are you looking at me as a suspect?" 860 F.2d 1528, 1529 (9th Cir. 1988) (The defendant continued, "Because if you are, it's … a serious charge and I think I should have counsel, if that's where … you're coming from, just tell me if you are."). The *Endell* Court held that the defendant's

---

[14] The majority's own language further emphasizes why their conclusion is erroneous. They state, "*in our view*, [Columna] did not unambiguously invoke his right to counsel[.]" (Maj. Op. at 14 n.13.) The Supreme Court expressly prohibits consideration of post-request statements in determining whether the request constituted an invocation. *Smith v. Illinois*, 469 U.S. 91, 98-99 (1984). Their later attempts to color this decision as a factual finding does not change the Court's prohibition on examination of subsequent statements. *Cf. Edwards v. Arizona*, 451 U.S. 477, 487 (1981) (discussing a determination of waiver as a legal holding, not a factual finding).

"initial request for counsel was not equivocal or ambiguous. It was conditional, but the investigators knew the condition to be satisfied[,]" thus, "[c]ommunication … should have ceased until an attorney was present." *Id.* at 1531.

Just so here. If the agents effectively had him under arrest – and they did – then he wanted an attorney. The agents testified at the suppression hearing that nothing "changed between the end of [their] discussion with [Columna] and [their] decision to say you're under arrest. … [T]here was [no] new information." (J.A. at 165-66.) Instead, Dominguez confirmed to Columna what was already obvious, at least to the agents: he was under arrest. The agents therefore "could not have mistaken [Columna's] meaning. Since they knew him to be [under arrest], questioning should have stopped until an attorney was present[.]" *Endell*, 860 F.2d at 1531-32.

But even if there were some legal distinction between custody and arrest in a context like this, it makes no difference here because Columna had sufficiently invoked his right to counsel. We know that because the agents understood that he was requesting an attorney. Unless the government is prepared to stipulate that the agents here are not reasonable law enforcement officers, we don't have to figure out what "a reasonable officer in light of the circumstances would have understood[;]" the agents here *did* understand that Columna was invoking his right to counsel. *Davis*, 512 U.S. at 459.

Accordingly, the agents' interrogation should have stopped. That is not what happened.

27

*2. No Waiver*

Under *Miranda*, once the right to counsel is invoked, all questioning must cease until an attorney is present, 384 U.S. at 474, unless the right is waived, *North Carolina v. Butler*, 441 U.S. 369, 372-76 (1979). "[A] valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation[.[15]]… [He] is not subject to further interrogation … until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85.

The police are not permitted to reinitiate a conversation. In *Edwards v. Arizona*, the Supreme Court held that, the day after invoking his right to counsel, the suspect was subjected to custodial interrogation "at the instance of the authorities" when the police again advised him of his *Miranda* rights and requestioned him. 451 U.S. at 487. Thus, the suspect's "statement[] made without having had access to counsel[] did not amount to a valid waiver and hence was inadmissible." *Id.*; *see also Arizona v. Roberson*, 486 U.S. 675, 686 (1988) (holding that there was a "serious risk that the mere repetition of the

---

[15] "[W]aivers … must … be voluntary, …[and] constitute a knowing and intelligent relinquishment … of a known right[,]" *Edwards*, 451 U.S. at 482, which depends "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Id.* And, "once a suspect has asked for the assistance of counsel, 'it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the inherently compelling pressures [of custodial interrogation] and not the purely voluntary choice of the suspect." *Alston v. Redman*, 34 F.3d 1237, 1243 (3d Cir. 1994) (quoting *Arizona v. Roberson*, 486 U.S. 675, 681 (1988)). Because Columna did not waive his right to counsel, we need not decide whether it was knowing or voluntary.

*Miranda* warnings would not overcome the presumption of coercion[,]" despite three days elapsing between the "unsatisfied request for counsel and [] interrogation").

The sequence of events matters. In *Missouri v. Seibert*, the Supreme Court noted that, "[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had [] genuine [*Miranda*] right[s.]" 542 U.S. 600, 613 (2004). Thus, "when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Id.* at 613-14. The Court has looked to factors such as whether the post-*Miranda* questioning "proceeded after a pause of only 15 to 20 minutes, in the same place[,]" whether the same officer conducted both the pre- and post-*Miranda* questioning, and whether the officer referred to previous conversation topics from before the warning. *Id.* at 616.

Here, there is no dispute that both times that Dominguez gave *Miranda* warnings to Columna, Columna declined to sign the waiver form.[16] There is also no dispute that Columna answered questions after the second warnings, which followed what Dominguez admitted was an invocation of the right to counsel.[17] Columna only spoke

---

[16] That is not dispositive. *See Berghuis v. Thompkins*, 560 U.S. 370, 383-84 (2010) ("[W]aivers can be established even absent formal or express statements of waiver" and "can include waiver implied from all the circumstances."). But it is informative. *See Minnick v. Mississippi*, 498 U.S. 146, 148 (1990) (considering a signed waiver form as a factor in whether the re-initiation was coerced).

[17] The interaction proceeded as follows:

again *after* Dominguez said, "O.K. [Unintelligible]  So, this is where we are[,] now you're under arrest?  O.K.?  Just so you know and it's because you participated in the [] trafficking of cocaine.  That was, that's really why you're in this problem now, so I am going to read you your rights again." (J.A. at 209.)  The same law enforcement agent, after an eight-minute break, re-initiated the conversation with Columna by referring to his earlier statements and then re-reading the *Miranda* warnings to him.  It is hard to imagine a more blatant violation of the instructions laid out in *Seibert*, 542 U.S. at 613-14, which are really only a reiteration of long-standing doctrine under *Miranda*, 384 U.S. at 474.

Because Columna invoked and did not waive his right to counsel, any statements made on St. Thomas should have been suppressed.

---

**Dominguez.**  [I]f you want to talk to us, we need you to say, "Yes, I am going to talk to you without an attorney."  If you want an attorney, you can have an attorney.  The conversation we're going to have is the same as the one we already had.

… [officers speak in English to each other]

**Columna.**  No, [unintelligible] if I'm under arrest, I need an attorney, I mean, even if afterwards, you know, the family can get me another one to … a main one, no? Because I am already under arrest, and I used to work for you, right?

**Dominguez.** O.K. now another minute.

…. [eight minutes go by]

**Dominguez.**  O.K.  [Unintelligible]  So this is where we are … now you're under arrest. … [continues speaking].

(J.A. at 207-209.)

30

## C.   The District Court's erroneous rulings were not harmless.

As the statements should have been suppressed, we must reverse the District Court's ruling unless the error "was harmless beyond a reasonable doubt, *i.e.*, [the government] proves beyond a reasonable doubt that the inculpatory statements did not contribute to [Columna's] conviction." *Brownlee*, 454 F.3d at 148 (internal quotation marks omitted) (applying the test to a *Miranda* violation).  The government itself concedes that if we hold that the District Court erroneously admitted both statements, the error is not harmless.

That concession is wise because the Supreme Court recognized in *Arizona v. Fulminante* that "[a] confession is like no other evidence.  Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him."  499 U.S. 279, 296 (1991).  "Moreover, it is difficult for the [g]overnment to argue with effect that the admission of the confession did not contribute to [Columna's] conviction when it submitted just the opposite view to the jury during the trial."  *Brownlee*, 454 F.3d at 148.  The government referred to Columna's St. Thomas and St. John confessions during its opening statement and closing argument; it introduced testimony regarding the St. John confession three times through Dominguez, Martinez, and Ashley; and it played the videotaped interrogation of Columna at FBI headquarters (for 20-30 minutes), which – along with the translated transcript for the jurors – was introduced into evidence.  "[I]t is clear that the jury might have believed that the two confessions reinforced and corroborated each other.  For this reason, one confession was

31

not merely cumulative of the other." *Fulminante*, 499 U.S. at 299. Their admission into evidence was not harmless error.

Even if only one confession had been admitted, that admission would not have been harmless error. "[A] full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision." *Id.* at 296. The government, thus, cannot prove that the verdict "was surely unattributable to the error[.]" *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993).

## III. CONCLUSION

"A *Miranda* violation … affords a bright-line, legal presumption of coercion, requiring suppression of all unwarned statements." *Elstad*, 470 U.S. at 306 n.1. Because Columna made the statements under custodial interrogation without properly being advised of his Fifth Amendment rights, and because, even after invoking his right to counsel, he was further engaged in conversation by the agents, the District Court erred in denying his motion to suppress. I therefore respectfully dissent as to the portion of the majority opinion addressing the right to remain silent and the right to counsel. I would reverse the suppression ruling, vacate the conviction and sentence, and remand for further proceedings.